Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports.  Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 18, 2006          Decided June 13, 2006

No. 04-3062

UNITED STATES OF AMERICA,
APPELLEE

v.

REGINALD CURTIS CARTER,
*A/K/A* REGGIE, *A/K/A* BLACK,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 00cr00252-03)

———

*David B. Smith*, appointed by the court, argued the cause for appellant.

*John P. Mannarino*, Assistant U.S. Attorney, argued the cause for appellee.  With him on the brief were *Kenneth L. Wainstein*, U.S. Attorney, and *Roy W. McLeese, III*, *Martin D. Carpenter*, and *Thomas J. Tourish, Jr.*, Assistant U.S. Attorneys.

Before: ROGERS, TATEL and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: "Operation Hole in One" was a multi-year investigation by the Federal Bureau of Investigation ("FBI") and the D.C. Metropolitan Police Department ("MPD") of a heroin trafficking operation in northeast Washington, D.C. Reginald C. Carter was identified as being part of the trafficking operation and he was subsequently convicted by a jury of possession with intent to distribute heroin and conspiracy to distribute and possess with intent to distribute heroin and cocaine. On appeal, Carter challenges his conviction on the ground the district court erred in denying his motion to suppress evidence obtained from the wiretapping of his cell phone because the government failed to meet its burden under the wiretapping statute to prove that the wiretaps were necessary and that it had limited the wiretapping of conversations not pertinent to the investigation. Carter contends further, for the first time on appeal, that the district court erred in instructing the jury on the scope of his conspiratorial agreement and that he was denied the effective assistance of trial counsel under the Sixth Amendment to the Constitution in moving to suppress the wiretap evidence. Carter also challenges his life sentence on both procedural and substantive grounds.

Our decisions in *United States v. Sobamowo*, 892 F.2d 90 (D.C. Cir. 1989), and *United States v Anderson*, 39 F.3d 331, 342 (D.C. Cir. 1994), *rev'd in part on other grounds by United States v. Anderson*, 59 F.3d 1323 (D.C. Cir. 1995), are dispositive of Carter's suppression claim under the wiretapping statute. Likewise, our decision in *United States v. Childress*, 58 F.3d 693, 722 (D.C. Cir. 1995), demonstrates the district court did not plainly err in instructing the jury on the scope-of-agreement requirement. Although Carter's ineffective

assistance of counsel claim regarding his suppression motion presents an interesting question regarding the scope of the suppression remedy for a violation of the wiretap statute, the court need not resolve this question because Carter cannot show the requisite prejudice under *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). We must remand Carter's case, however, because the district court failed to point to evidence supporting its finding that Carter was responsible for the distribution of over 30 kilograms of heroin and failed to make the required findings on Carter's role as an "organizer or leader" of criminal activity under U.S. Sentencing Guidelines § 3B1.1(a). *Childress*, 58 F.3d at 722. In addition, Carter is entitled to a limited remand in light of *United States v. Booker*, 543 U.S. 220 (2005). *See United States v. Coles*, 403 F.3d 764, 769 (D.C. Cir. 2005). Accordingly, we remand the case to the district court on Carter's sentence but otherwise affirm the judgment of conviction.

## I.

In December 1996, the FBI and the MPD began investigating heroin trafficking in the Langston Carver Terrace neighborhood in northeast Washington, D.C. The task force engaged in undercover drug buys, search warrants, audio and video surveillance, and, ultimately, court-authorized wiretaps. A confidential informant alerted the task force in February 1999 that Carter was a possible supplier of heroin to a drug dealer, Ricardo Lanier. In April 2000, the district court[1] approved the wiretapping of Carter's cell phone; the court extended the wiretap authorization on two occasions. Over a 76-day period, 964 completed calls were made to and from Carter's cell phone. Of these calls, 600 were classified as "pertinent" to the

---

[1] Judge Thomas Penfield Jackson approved each of the wiretap applications. Judge Ricardo Urbina presided at Carter's trial.

investigation; of the 364 "non-pertinent" calls, the monitoring agents limited (i.e., minimized) their taping of 100 calls.

Evidence from the wiretaps and surveillance indicated that Lanier was receiving his supply of heroin from a larger drug trafficking organization involving numerous individuals, including Carter, Carter's cousin Earl Garner, Jr. ("Junior"), and Junior's father Earl Garner, Sr. ("Senior"). In 1996 Carter and Junior had approached Senior about setting up a heroin distribution operation. The operation expanded in late 1998, and again in 1999, when Carter and Senior established a drug "lab" at an apartment in Maryland where they cut, weighed, and stored the drugs and counted the money from the drug sales. In 2000, Carter and Junior assumed a more visible role and more responsibility for the drug sales after Senior became concerned about police surveillance. By this time, Carter was distributing 14 to 500 grams of heroin weekly. To avoid detection by the police, Carter and Senior eventually moved the contents of the Maryland lab to an apartment in Washington, D.C.; Carter had the only key to the apartment.

"Operation Hole in One" ended when Carter, the Garners, and approximately 30 others were arrested on August 8, 2000. At that time 300 law enforcement officials executed 35 search warrants. Recovered was over one million dollars in cash, several kilograms of heroin, drug paraphernalia, including cutting materials, and nineteen firearms, including three from the D.C. apartment.

Carter was indicted on five counts: (1) conspiracy to distribute and possess with intent to distribute heroin and cocaine, 21 U.S.C. §§ 846 and 841(b)(1)(A)(i); (2) possession with intent to distribute 100 grams or more of heroin, 21 U.S.C. §§ 841 and 841(b)(1)(B)(i); (3) violation of the felon-in-possession statute, 18 U.S.C. § 922(g)(1); (4) participation in a

continuing criminal enterprise, 21 U.S.C. § 848; and (5) the use of a firearm in relation to a drug trafficking offense, 18 U.S.C. § 924(c)(1). The district court denied his pretrial motion to suppress the wiretap evidence. A jury found him guilty on Counts (1) and (2) and also found that the quantity of heroin involved in the conspiracy count exceeded one kilogram. Applying the mandatory Sentencing Guidelines then in effect, the district court sentenced Carter to life imprisonment, assigning him a base offense level of 38 after attributing 35 kilograms of heroin to him, U.S.S.G. § 2D1.1(c)(1), and a four-level enhancement for his role as an "organizer or leader" of criminal activity, *id*. § 3B1.1(a).

## II.

### A.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.*, authorizes the district court to approve an application for the interception of certain wire, oral, or electronic communications. 18 U.S.C. § 2518. The wiretap statute requires that an application for a wiretap shall be in writing, under oath, and shall contain certain information including "a full and complete statement of the facts and circumstances relied upon by the applicant[] to justify his belief that an order should be issued." *Id*. § 2518(1). On the basis of the facts submitted by the applicant, the district court may authorize a wiretap upon finding that (1) probable cause exists to believe that an individual has committed or is about to commit one of certain enumerated offenses; (2) probable cause exists to believe that "particular communications concerning that offense will be obtained" through an interception; (3) "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried"; and (4) probable cause exists to believe that the communication facility

sought to be wiretapped "[is] being used, or [is] about to be used, in connection with the commission of [the] offense." *Id*. § 2518(3)(a-d); *see United States v. Donovan*, 429 U.S. 413, 435 (1977). The determination that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(3)(c), is referred to as the "necessity requirement," and it is the "keystone of congressional regulation of electronic eavesdropping." *United States v. Williams*, 580 F.2d 578, 587-588 (D.C. Cir. 1978).

The wiretapping statute also requires that "[e]very [wiretap] order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable [and] shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception . . . ." 18 U.S.C. § 2518(5). This is referred to as the "minimization requirement." Although "[t]he statute does not forbid the interception of all nonrelevant conversations," the government must make reasonable efforts to "minimize" the interception of such conversations. *Scott v. United States*, 436 U.S. 128, 139-40 (1978). The statute also provides that an order authorizing an interception cannot extend "for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days." 18 U.S.C. § 2518(5).

The wiretap statute provides that "no part of the contents of [intercepted] communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding . . . if the disclosure of that information would be in violation of this chapter." *Id*. § 2515. The "aggrieved person" may move to suppress the introduction of wiretap evidence or its fruits if "the communication was unlawfully intercepted," the "order of authorization or approval under which it was

intercepted is insufficient on its face," or if "the interception was not made in conformity with the order of authorization or approval." *Id.* § 2518(10)(a)(i-iii); *see Donovan*, 429 U.S. at 433-34.

**B.**

Necessity. Carter contends that the district court abused its discretion in finding the government had met its burden to demonstrate the wiretap of his cell phone was necessary under 18 U.S.C. § 2518(1)(c). He asserts that the tap was sought immediately upon discovering Carter's role as Lanier's supplier without efforts by the government to attempt normal investigative procedures. He further asserts that the wiretap application omitted material facts from its affidavits in support of the wiretap application and its extensions.

Congress created the necessity requirement to ensure that "wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974). To adhere to Congress's purpose, a court will "give close scrutiny" to a contested wiretap application and will "reject generalized and conclusory statements that other investigative procedures would prove unsuccessful." *Williams*, 580 F.2d at 588. Because, however, the "statutory command was not designed to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted," the government will meet its burden of demonstrating necessity if it shows that "other techniques are impractical under the circumstances and that it would be unreasonable to require pursuit of those avenues of investigation." *Id.* (internal quotation marks omitted).

In *Sobamowo*, this court held that "a court may authorize

the wiretap of the phone of a member of an operation if traditional investigative techniques have proved inadequate to reveal the operation's full nature and scope." *Sobamowo*, 892 F.2d at 93 (citing *United States v. Brown*, 823 F.2d 591, 598 (D.C. Cir. 1987)) (internal quotation marks omitted). The defendant contended that the government had failed to investigate him adequately before resorting to a wiretap and instead had improperly relied on prior affidavits submitted to obtain a telephone wiretap of another defendant (Adair), who was a purchaser of Sobamowo's heroin. *Id*. The court rejected the necessity challenge because "[e]vidence collected by the government and detailed in the [prior Adair] affidavits revealed that a conspiracy existed and that [Sobamowo] was connected with it," and because "[b]efore seeking to tap [his] telephone, the government in fact attempted to gather information about him in other ways." *Id*. The court held that, "[c]onsidered in conjunction," the description of Adair's conspiracy and the earlier efforts to investigate Sobamowo described in the Sobamowo affidavit were sufficient to justify the district court's determination that a wiretap was necessary. *Id*. Like the defendant in *Sobamowo*, Carter faults the government's reliance on material in affidavits used in conjunction with an application for a wiretap on another target (Lanier) and faults the government for failing to investigate him using non-wiretap techniques. The analysis in *Sobamowo* is therefore apt, and we reach the same conclusion.

The wiretap application of April 25, 2000, submitted on behalf of "Operation Hole in One," included a 52-page affidavit by FBI Special Agent Lawrence Alexander describing the nature of the task force's drug investigation and explaining the need for the wiretap. The affidavit recounted specific evidence, derived from a pre-existing wiretap on Lanier's cell phone and telephone communications, that linked Carter to the Lanier heroin trafficking organization. The affidavit thus established that

Carter was a "member of an operation" by adducing evidence that "a conspiracy existed and that [Carter] was connected with it." *Id.* Further, as did the affidavit in *Sobamowo*, the affidavit here indicated that "[b]efore seeking to tap [Carter's] telephone, the government in fact attempted to gather information about [him] in other ways." *Id.* The affidavit stated that physical surveillance of Carter had been conducted and that such surveillance would be unlikely to succeed, both because of counter-surveillance methods engaged in by Carter and because physical surveillance alone would not generate detailed information on the activities and associates of Carter, Senior, and Lanier. The affidavit also stated reasons why other non-wiretap investigative techniques, such as physical surveillance, undercover informants, infiltration, or a "buy-bust," would be inadequate to reveal the "full nature and scope" of the drug conspiracy. *Id.* Because Carter was a "wholesale" drug supplier and dealt with a small circle of "retail" or street-level drug dealers with whom he was already familiar, Special Agent Alexander averred that Carter's operations were unlikely to be susceptible to infiltration by normal investigative techniques. Consequently, "[c]onsidered in conjunction," the description of the Lanier drug operation and the account of prior investigative efforts against Carter justified the district court's determination that the wiretap of Carter's cell phone was necessary. *Id.*

Carter's other objections are unpersuasive. Carter's focus on the brief two-day period between his identification by an informant and the wiretap application ignores that the affidavit accompanying the original wiretap application states that the task force had intercepted drug-related conversations between Carter and Lanier as early as March 14, 2000, well over a month before the government applied to wiretap Carter's cell phone. To the extent Carter challenges the district court's extensions of the wiretap authorization, his claim fails because no authority indicates that the government must cease to request wiretaps as

soon as it becomes clear that another technique, such as a search warrant, may prove useful in a limited way. The necessity requirement "was not designed to foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted." *Williams*, 580 F.2d at 588 (internal quotation marks omitted). Although it would likely have incriminated Carter, the immediate execution of a search warrant on Carter's D.C. drug-lab apartment would not have revealed the "full nature and scope," *Sobamowo*, 892 F.2d at 93, of Carter's conspiracy and the premature execution of a search warrant would have jeopardized the task force's effort to gather information about the rest of Carter's drug network by alerting Carter's co-conspirators of the ongoing investigation. Nor has Carter demonstrated that there were any material omissions in the affidavits supporting the wiretap application and extensions; the government's failure to inform the district court of the installation of a tracking device on Carter's car was of no moment because the affidavits set forth the reasons why such physical surveillance was inadequate to penetrate Carter's conspiracy and because such an omission does not undercut the fact that the government had "engaged in an adequate range of investigative endeavors," *id.*, with regard to Carter.

In light of *Sobamowo*, then, Carter fails to demonstrate that the district court abused its discretion in finding the government had met its burden to demonstrate the wiretaps of his cell phone were necessary under 18 U.S.C. § 2518(1)(c).

**C.**

Minimization. Carter also contends that the fact that only 27% of the non-pertinent calls were minimized demonstrates on its face that the government failed to fulfill its statutory obligation under 18 U.S.C. § 2815(5). He maintains that the

district court therefore erred in denying his motion to suppress without a hearing or an adequate explanation by the government that it made reasonable efforts to minimize the interception of non-pertinent calls.

In *Anderson*, the court observed that "[t]he Supreme Court has indicated that the minimization requirement is not an absolute prohibition on the interception of nonrelevant conversations." 39 F.3d at 342 (citing *Scott*, 436 U.S. at 135). The court held there that a defendant who does not identify "specific conversations that should not have been intercepted, or even . . . a pattern of such conversations" has offered no "concrete indications that the government failed to meet its obligations to minimize intercepted communications," and thereby failed to show error by the district court. *Id.* Here, Carter's motion to suppress the cell phone wiretap evidence did not identify any conversation or pattern of conversations by which the district court could determine whether or not the government had met its minimization obligations. Rather, Carter only generally faulted the government's failure to minimize "communications unrelated to the purpose of the interception," such as "[c]onversations . . . particularly pertaining to golf." This is not an adequate objection. What the wiretapping statute forbids is failure by the government to make reasonable efforts to minimize interceptions of non-pertinent communications; consequently, a defendant must identify particular conversations so that the government can explain their non-minimization. Having failed to identify "specific conversations that should not have been intercepted, or even . . . a pattern of such conversations," *Anderson*, 39 F.3d at 342, the issue of reasonable minimization was simply not in play.

Carter repeatedly points to the fact that the government only minimized 27% of non-pertinent calls. But in *Scott*, the Supreme Court, in evaluating the reasonableness of the

government's efforts at minimization, explained that a high interception rate of nonpertinent calls could be the outcome of reasonable efforts at minimization in situations where the intercepted calls were "very short," "one-time only," or were "ambiguous in nature or apparently involv[ing] . . . guarded or coded language." *Scott*, 436 U.S. at 140. Consequently, "blind reliance on the percentage of nonpertinent calls intercepted is not a sure guide." *Id*. Carter is thus precluded from relying solely on the existence of a raw percentage of non-pertinent intercepted calls as a means of demonstrating that some conversations were intercepted when they would not have been had reasonable attempts at minimization been made. *Id*.

There is therefore no basis to conclude that the district court abused its discretion in failing *sua sponte* to hold an evidentiary hearing, *see United States v. Santora*, 600 F.2d 1317, 1320 (9th Cir. 1979), or to require the government to provide a detailed explanation of the low percentage of minimized non-relevant calls.

## III.

In light of trial counsel's failure to conform to the particularization requirements of *Scott* and *Anderson* in moving to suppress the wiretap evidence and its fruits, Carter contends that he was denied the effective assistance of counsel guaranteed by the Sixth Amendment to the Constitution and seeks a remand for an evidentiary hearing. When, as here, a defendant raises an ineffective assistance claim for the first time on appeal, the court will remand the case to the district court for an evidentiary hearing unless the trial record "conclusively shows that the defendant is entitled to no relief." *United States v. Geraldo*, 271 F.3d 1112, 1115-16 (D.C. Cir. 2001). A remand is unnecessary here.

Assuming trial counsel's failure to pursue properly Carter's minimization claims amounts to a failure to meet the standard for attorney performance under the first prong of the test for ineffective assistance of counsel under *Strickland*, 466 U.S. at 687, Carter cannot show the requisite prejudice. Under the second prong of the *Strickland* test, Carter must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.; *see United States v. Moore*, 394 F.3d 925, 931 (D.C. Cir. 2005). The government maintains that Carter suffered no prejudice due to his trial counsel's ineffective assistance because Carter's only remedy for the government's failure to minimize was suppression of the non-relevant calls and a civil cause of action against the government for damages. Carter responds that such a remedy would be meaningless, particularly as he lacks the wherewithal to pursue a claim for civil damages under the statute.

The Supreme Court has yet to address the scope of suppression for a violation of the statutory minimization requirement. *See Scott*, 436 U.S. at 135 n.10; *see generally Donovan*, 429 U.S. at 433-34. The question is open in this circuit. *See Anderson*, 39 F.3d at 342 (dictum); *United States v. Scott*, 516 F.2d 751, 760 n.19 (D.C. Cir. 1975) (dictum), *aff'd by Scott*, 436 U.S. at 128. We need not answer the question. Carter has failed to show a "reasonable probability," *Strickland*, 466 U.S. at 687, that if his trial counsel had properly raised the minimization argument in the motion to suppress the district court would have found the government's efforts at minimization to be unreasonable.

Carter maintains that "numerous personal calls" between himself and his grandmother, wife, daughter, and stockbroker

were not minimized or were not minimized soon enough. He does not explain, however, how effective counsel could have demonstrated to the district court that the interception of these calls indicated that the government's efforts at minimization were in violation of the statute. Carter cannot rely solely on the raw percentage of intercepted non-pertinent calls to demonstrate that the government failed to comply with its obligations to minimize. *See Scott*, 436 U.S. at 140. He cannot deny that the task force made some effort to minimize interception of non-pertinent calls: 100 non-pertinent calls had been minimized and over 62% of all intercepted calls were pertinent. And, as the Supreme Court observed in *Scott*, 436 U.S. at 139, the fact that the investigation of a target is part of a larger investigation of "a widespread conspiracy" and the fact that the target and his co-conspirators communicate in code language are circumstances that would justify "more extensive surveillance" by the government. *Scott*, 436 U.S. at 140. Moreover, before the wiretap on Carter's phone commenced, the prosecutor instructed the task force agents on their minimization duties and periodically reviewed the records of call interceptions for compliance. The three district court orders approving the wiretaps on Carter's cell phone required a report after ten days on the investigation's progress and on the need for continued surveillance, thus ensuring the interceptions were judicially monitored during the execution of the wiretaps. *See* 18 U.S.C. § 2518(6); *United States v. Wilson*, 835 F.2d 1440, 1446 (D.C. Cir. 1987). On the face of the record, then, it is unclear whether the government's minimization efforts constituted a violation of the wiretapping statute.

Furthermore, Carter's "minimization arguments are couched in the broadest of terms." *Chagnon v. Bell*, 642 F.2d 1248, 1262-63 (D.C. Cir. 1980). He proffers no facts or affidavits containing "information as to the number, timing, frequency, or subject matter," *id.*, of a pattern of conversations

alleged to be inadequately minimized, information that could enable this court to conclude that a remand is required for a determination of whether he was prejudiced. The government posits in its brief, *see* Appellee's Br. at 20 n.18, that many of the non-minimized calls may have been of brief duration and may have been made during "the early stages of surveillance" when "the agents may be forced to intercept all calls to establish categories of non-pertinent calls which will not be intercepted thereafter," *Scott*, 436 U.S. at 141. The government also suggested during oral argument that some non-minimized calls may have been intercepted because they appeared to involve the use of code words. For example, the conversations pertaining to golf, which Carter cited as evidence of the government's failure to minimize interception of innocent conversations, might well have initially appeared suspicious to agents of "Operation Hole in One," which was so named because members of the Lanier drug trafficking organization would frequently meet at a golf course.

Carter neither cites record evidence nor proffers other evidence that would cast doubt on the government's posited explanations. The three examples of improperly intercepted calls that Carter cites, *see* Appellant's Reply Br. 12 n.1—a three-minute call on the sixth day of the wiretap, a five-minute call regarding golf that was in fact minimized by the intercepting agents, and a two-minute call—fall short of establishing that with effective trial counsel Carter could have succeeded in demonstrating unreasonable efforts at minimization by the government. Although Carter claims that record citations were not possible because "the telephone logs kept by the monitoring officers are not part of the [district court] record," *id.*, nothing barred him from proffering facts that, if credited, would demonstrate a reasonable probability that with effective counsel he would have been able to show the wiretaps were inadequately minimized. *Cf. United States v. Taylor*, 139 F.3d 924, 932-33

(D.C. Cir. 1998); *United States v. Pinkney*, 543 F.2d 908, 916 (D.C. Cir. 1976). "Without such facts, there can be no support . . . for the contention that the [wiretap] was inadequately minimized." *Chagnon*, 642 F.2d at 1263.

Absent either a record that on its face supports his claim or evidence that would support a finding that the government engaged in a pattern of violations, Carter's virtually unsupported assertion that effective counsel could have persuaded the district court to conduct a hearing or to require a detailed explanation by the government regarding the reasonableness of its minimization efforts cannot suffice to show a "reasonable probability" the district court would have found the government's minimization efforts were unreasonable. There is thus no reason to remand the case for a hearing on prejudice. *See Geraldo*, 271 F.3d at 1115-16.

**IV.**

The district court instructed the jury that it must find whether Carter "knew or should have known that the total amount of the mixture or substance containing heroin involved in the conspiracy was one kilogram or more." The jury was instructed that it had to make this finding beyond a reasonable doubt. The jury was also instructed that a "crime" or "illegal action" cannot be attributed to co-conspirators unless it was committed "in order to further or somehow advance" the conspiracy's objectives. The jury verdict form, in turn, instructed the jury that Carter could be held responsible for his co-conspirators' drug possession or distribution only if such possession or distribution was both foreseeable to Carter and "in furtherance of" Carter's conspiracy.

In *Childress*, 58 F.3d at 722, the court described "two substantive limitations on a defendant's responsibility for acts

undertaken by co-conspirators": those acts "must be 'in furtherance of' the same conspiracy to which the defendant has agreed, and they must be reasonably foreseeable to the defendant." *Id*. (quoting U.S.S.G. § 1B1.3 cmt. n.1) (1989)). Carter does not challenge the district court's instructions on the foreseeability element but contends that the district court failed to instruct the jury properly regarding its findings on the quantity of drugs that fell within the "scope" of Carter's conspiratorial agreement. Because Carter raises this objection for the first time on appeal, our review is for plain error. *See Johnson v. United States*, 520 U.S. 461, 465-67 (1997); *United States v. Gaviria*, 116 F.3d 1498, 1509 (D.C. Cir. 1997); *United States v. Spann*, 997 F.2d 1513, 1515 (D.C. Cir. 1993). The words "in furtherance of" accurately convey the "scope" element of co-conspirator liability, *Childress*, 58 F.3d at 722, and the jury verdict form reflects that the jury found Carter responsible for over one kilogram of heroin based upon a correct statement of the law of co-conspirator liability. *See United States v. Washington*, 106 F.3d 983, 1012 (D.C. Cir. 1997). Consequently, Carter fails to show plain error because the jury instructions would have not led the jury to attribute to him actions of his co-conspirators falling outside the "scope" of his conspiratorial agreement.

## V.

Carter contends that his life sentence must be set aside and the case remanded for resentencing because the district court's factual findings were inadequate to permit meaningful appellate review of the determination that (1) 30 kilograms of heroin were properly attributable to him, establishing a base offense level of 38 under U.S.S.G. § 2D1.1, and (2) his role in the conspiracy warranted a four-point enhancement in his offense level under U.S.S.G. §3B1.1(a). Carter also contends that he was denied the effective assistance of counsel at sentencing because his counsel

failed to argue that Carter exerted no authority or control over his co-conspirators.

Carter's contention that the district court lacked authority at sentencing to find the quantity of drugs attributable to him and that thus he is subject only the statutory maximum of twenty years in prison, *see Apprendi v. United States*, 530 U.S. 466 (2000), is baseless; he was charged with and convicted of conspiracy to violate 21 U.S.C. § 841(b)(1)(A)(i), which carries a maximum sentence of life. However, in determining the quantity of drugs attributable to a defendant, the sentencing judge must point to evidence sufficient to support its findings. *See, e.g., United States v. Stover*, 329 F.3d 859, 871 (D.C Cir. 2003). At sentencing, the district court did not point to evidence that Carter alone distributed over 30 kilograms of heroin, nor does the government contend that the record could support such a finding. Rather, the government maintains that 30 kilograms of heroin were properly attributable to Carter because the district court credited testimony indicating that this quantity of heroin fell within the scope of Carter's conspiratorial agreements with the two Garners and Lanier. The district court, however, did not make sufficient findings on the scope of Carter's conspiratorial agreement with the Garners and Lanier to warrant the attribution to Carter of drugs sold by Carter's co-conspirators. *See United States v. Tabron*, 437 F.3d 63, 68 (D.C. Cir. 2006); *Childress*, 58 F.3d at 710. For example, although the government in its brief on appeal contends that the evidence at trial supported the attribution of more than 30 kilograms of heroin to Carter because his agreement encompassed the "cutting" of pure heroin by his customers, the district court did not find that "cut" quantities sold by dealers such as Lanier were properly attributable to Carter. Such a finding is necessary before a district court may sentence a defendant for conduct ostensibly within the scope of his conspiratorial agreement. Nor did the district court's adoption of the findings in the presentence report

fill the gap; "when facing a claim of factual inaccuracy, the district court cannot satisfy th[e] requirement [to make findings] by simply adopting the presentence report." *United States v. Thomas*, 114 F.3d 228, 255 (D.C. Cir. 1997); *United States v. Graham*, 83 F.3d 1466, 1477 (D.C. Cir. 1996).

The district court's findings also do not support a four-level enhancement for Carter's role as an "organizer" or "leader" of criminal activity under U.S. Sentencing Guideline § 3B1.1(a). The district court found only that Carter was a "point of contact" for heroin for several people and that Carter had "persons delegated to him," not that Carter exercised authority over others or was "hierarchically superior" to them. *United States v. Quigley*, 373 F.3d 133, 140 (D.C. Cir. 2004). The "[Sentencing] [G]uidelines punish organizers and leaders more severely" than mere participants only because "the more control (that is, responsibility) the offender exercises over the conspirators, the more culpable that offender is, and the greater sentence she deserves." *Id.* at 139-40. One who occupies an "organizer" or "leader" position plays a role distinct from the role of a mere "'hub' or 'orchestrator'" of the conspiracy. *Id.* Absent findings by the district court on Carter's degree of control or authority over his associates, the district court could not enhance his sentence under § 3B1.1(a). *See United States v. Graham*, 162 F.3d 1180, 1185 (D.C. Cir. 1998); *Thomas*, 114 F.3d at 261.

Accordingly, we remand the case to the district court to make the necessary findings in support of the life sentence or, in the absence of such findings, to resentence Carter, but otherwise affirm the judgment of conviction. Further, although Carter is not entitled to a full re-sentencing in light of *Booker*, 543 U.S. 220, 268, *see United States v. Gomez*, 431 F.3d 818, 824 (D.C. Cir. 2005), he is entitled to a limited remand under *Coles*, 403 F.3d at 769, because "[a]t sentencing, the district court said

nothing from which we can deduce what course it would have taken in the absence of a mandatory Guidelines regime." *United States v. Mejia*, No. 02-3067, 2006 WL 1506853, *15 (D.C. Cir. June 2, 2006); *Gomez*, 431 F.3d at 824.