# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 20, 2015        Decided August 7, 2015

No. 13-3051

UNITED STATES OF AMERICA,
APPELLEE

v.

AURELIO CANO-FLORES, ALSO KNOWN AS YANKEE, ALSO
KNOWN AS YEYO,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cr-00057-16)

---

*Richard K. Gilbert*, appointed by the court, argued the cause for appellant. With him on the briefs was *Kristen Grim Hughes*, appointed by the court.

*Nina S. Goodman*, Attorney, U.S. Department of Justice, argued the cause and filed the brief for appellee.

Before: ROGERS and SRINIVASAN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Appellant Aurelio Cano-Flores appeals from his conviction for conspiring to manufacture and distribute cocaine and marijuana for importation into the United States, in violation of 21 U.S.C. §§ 959, 960, and 963. He raises a number of challenges to his conviction and sentence. We reject all, with one exception: we conclude that the $15 billion forfeiture assessed by the district court must be recalculated under the terms of 21 U.S.C. § 853(a)(1), and we remand to the district court for that purpose. Accordingly we do not reach Cano-Flores's argument that the forfeiture constituted an "excessive" fine in violation of the Eighth Amendment, or his contentions that the court miscalculated the forfeiture under its understanding of § 853(a)(1).

\* \* \*

Cano-Flores was a member of the Gulf Cartel, one of the largest and most infamous drug cartels in Mexico. A former Mexican state police officer, Cano-Flores participated in the cartel's takeover of Miguel Alemán, a Mexican border city or "plaza" across the Rio Grande from Roma, Texas. The officials and police in the town turned a blind eye to the cartel's drug trafficking, which took in roughly between $1 million and $2 million in weekly profits in Miguel Alemán alone. Cano-Flores was responsible for guarding shipments of marijuana and cocaine, and he several times completed drug sales. In late 2005 or early 2006, Cano-Flores became a "plaza commander" in Los Guerra, a town near Miguel Alemán that also borders Texas. As a "trusted man" in the cartel, he was in charge of transporting, storing, and distributing drugs in his territory, as well as accounting for the drugs and money that moved across the border.

Using wiretaps that are the subject of several claims on appeal, the Drug Enforcement Administration gathered evidence of the cartel's activities, leading to a 2008 indictment of Cano-Flores along with other cartel members. A warrant was issued for his arrest, and he was extradited to the United States in August 2011.

Cano-Flores argues that the wiretap authorization orders exceeded the jurisdiction of the issuing court, that the listening agents failed to properly minimize their overhearing of the intercepted conversations, and that the transcripts of those conversations were improperly sent into the jury deliberation room. As to sentencing, Cano-Flores argues that his below-Guidelines 35-year sentence was substantively unreasonable and that his $15 billion criminal forfeiture assessment was incorrectly calculated and in violation of the Eighth Amendment.

\* \* \*

The DEA conducted its wiretaps under authorizations from various federal district judges in the U.S. District Court for the Southern District of Texas. For each targeted telephone number, the telephone service provider (evidently always Nextel) directed the calls' content to a DEA "wire room" in Houston, where Spanish-speaking DEA contractors monitored the calls. So far as appears, the process intercepted only calls made near the border; when the cell phones were in roaming mode, they would seek the strongest signal, which was very commonly a cellphone tower in the United States.

Before trial, Cano-Flores moved to suppress evidence from the wiretap, arguing that the district court in Texas lacked jurisdiction to issue wiretap authorization orders targeting the calls because the devices were located in Mexico and the authorizing statute grants no authority to intercept

communications outside the United States. The statutory basis for the interceptions was Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 211, codified at 18 U.S.C. §§ 2510-2520, which permits district judges to issue orders authorizing "interception of wire, oral, or electronic communications within the territorial jurisdiction of the court in which the judge is sitting." 18 U.S.C. § 2518(3). Section 2510(4) in turn defines "intercept[ion]" as "aural or other acquisition of the contents of any wire, electronic, or oral communication."

Without addressing Cano-Flores's arguments about the ultimate reach of Title III, the district court found the interceptions lawful: they had taken place not in Mexico, but "in the DEA wire room located in Houston, Texas (a location within the Southern District of Texas) after they had been accessed by cellular towers located in the United States." Although the statute does not supply an explicit rule for determining where interception occurs, courts have integrated the language allowing "interception . . . within the territorial jurisdiction of the court in which the judge is sitting" with the language that defines "intercept" as the "aural or other acquisition of the contents of any . . . communication." On the basis of these provisions, for example, *United States v. Rodriguez*, 968 F.2d 130 (2d Cir. 1992), held that besides occurring at the site of the telephone, an interception "must also be considered to occur at the place where the redirected contents are first heard." *Id*. at 136. In a separate opinion, Judge Meskill, though rejecting this reasoning, gave it its name—the "listening post" theory. *Id*. at 144. The basic reasoning has been accepted in all courts of appeals to address the issue. See *United States v. Henley*, 766 F.3d 893, 911-12 (8th Cir. 2014); *United States v. Luong*, 471 F.3d 1107, 1109-10 (9th Cir. 2006); *United States v. Jackson*, 207 F.3d 910, 914-15 (7th Cir.), *vacated on other grounds*, 531 U.S. 953 (2000); *United States v. Denman*, 100 F.3d 399, 402-03 (5th

Cir. 1996); *United States v. Tavarez*, 40 F.3d 1136, 1138 (10th Cir. 1994).

Cano-Flores points out that in *United States v. Glover*, 736 F.3d 509 (D.C. Cir. 2013), we observed that the statute "does not refer to a 'listening post,'" *id*. at 514, which is of course true. But all we held there was that the statute did not authorize a magistrate in one jurisdiction to authorize the planting of a physical bug on private property in another jurisdiction, and we distinguished *Rodriguez* and similar cases as dealing with telephone intercepts. *Id*. at 514-15. We didn't mention and had no occasion to construe the "aural . . . acquisition" language of § 2510(4).

Cano-Flores argues that none of the cases applying the "listening post" theory involved taps of conversations occurring abroad. True enough, but we don't see how that alters the force of the general principle, which turns on the statutory language.

He also argues that the listening post theory, which predates the wireless era, should be inapplicable in cases involving wireless communications. But he points to no distinction between the two eras that calls for a different result. Of course it is true that the primary means by which end users interface with the telephone system has significantly changed. But that change alone is not what accounts for the expansiveness of the listening post theory, which Cano-Flores suggests is boundless. Whatever boundlessness the theory may imply is due to the fact that phones used in one location can be tapped in a way that allows agents to first hear them somewhere else, and he points to no special change in this characteristic. In fact courts have applied the principle equally to landlines, see *Rodriguez*, 968 F.2d at 135 (applying listening post theory to support jurisdiction in the Southern District of New York for evidence from four landline

telephones located in a New Jersey café), and cell phones, see *Henley*, 766 F.3d at 911-12 (upholding the Eastern District of Missouri's authorization of a wiretap on communications from a cellular phone located in Illinois).

The alleged boundlessness of which Cano-Flores complains stems from the statutory language, especially the definition of "intercept," which Cano-Flores does not try to parse. Moreover, whatever the force of the effects to which he points, there are opposing concerns. On his view government officials would be required to obtain a wiretap order in every district where they thought a target could make calls. Such a scheme seems unworkable. Moreover, by diffusing oversight responsibilities, it might weaken the courts' ability to protect citizens' privacy by monitoring the wiretap process. As *Rodriguez* suggested, "If all of the authorizations are sought from the same court, there is a better chance that unnecessary or unnecessarily long interceptions will be avoided." 968 F.2d at 136.

\* \* \*

Cano-Flores also sought suppression on the grounds that the agents listening to the calls failed to heed the Federal Wire Tap Statute's requirement that officials "conduct[] [the wiretap] in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter." 18 U.S.C. § 2518(5). Officials must make "reasonable" efforts to minimize the interception of non-relevant conversations. *United States v. Carter*, 449 F.3d 1287, 1295 (D.C. Cir. 2006) (citing *Scott v. United States*, 436 U.S. 128, 139-40 (1978)).

Cano-Flores proposes that we adopt a burden-shifting approach for determining whether the government adequately minimized. Under his proposal, Cano-Flores would need to

make a prima facie case of improper minimization, at which point the government would be required to "provide permissible explanations for the failure to minimize, especially explanations derived from the facts of its investigation." Of course the plausibility of the proposal turns largely on what constitutes a prima facie case. He argues that he made such a case when he provided the district court with a long list of calls that were longer than two minutes and were ultimately deemed "non-pertinent" in their entirety; non-minimization of such calls (continued listening by the agents, beyond the two minutes), he argues, is presumptively unreasonable.

But such an approach grossly oversimplifies the interception process. We've rejected the idea that a high *percentage* of nonpertinent non-minimized calls is, or is even likely to be, inconsistent with reasonable minimization efforts. *Carter*, 449 F.3d at 1295. As the Court made clear in *Scott*, a host of factors determines the reasonableness of interceptors' treatment of particular calls. A call may have been "very short," *Scott*, 436 U.S. at 140, a concern perhaps answered by Cano-Flores's two-minute dividing line. Calls may have been onetime, *id*., a matter Cano-Flores doesn't try to address. The Court also pointed to special problems with a wide-ranging conspiracy, such as the one here, where an initial wide cast of the net may be necessary to trace the conspiracy's scope. *Id*. at 140-41. As a consequence, we and the Supreme Court require defendants to "identify particular conversations so that the government can explain their non-minimization." *Carter*, 449 F.3d at 1295.

Cano-Flores's list of calls essentially mirrors the approach rejected in *Carter* and *Scott*. While the list identifies a large subset of calls, it does so primarily on the basis of length; it does not explain why specific call characteristics (such as recipients, content, or context) should have caused

the agents to recognize early on that the remainder of the call would not be pertinent. Once a defendant is provided with the list of intercepted calls and the tapes of those calls (as Cano-Flores was), he has not only the incentive to make a case on inadequate minimization but the information needed to do so. Whatever merit a burden-shifting scheme might have, Cano-Flores's proposal is unsound and his challenge to the minimization efforts is clearly insufficient under established law. The district court correctly rejected his motion to suppress the evidence.

\* \* \*

Cano-Flores raises a third issue related to the wiretap evidence: the district court's decision to allow translated transcripts from the wiretap recordings to go back into the jury room during deliberations. The parties spent several months negotiating over the transcription and translation of the calls, which of course were originally in Spanish. Cano-Flores contends that various stipulations made as to unintelligible and ambiguous portions of the wiretap recordings were made under the explicit understanding that the transcript binders would not go back to the jury room, and that the district court's reversal on that front (allowing the binders to go back) constituted error.

At the end of the trial, the district judge asked the parties whether they thought the transcripts should be sent back to the jury; over a defense objection, she eventually ruled that they would. She introduced the evidence in the recordings and transcripts to the jury as follows:

> During this trial you have been given transcripts of translations from Spanish into English of the conversations that could be heard on the wiretap recordings received in evidence. I have admitted the

transcripts for the purpose of aiding you and [sic; *in*] following the content of the conversations as you listen to the wiretaps which were spoken in Spanish and also to aid you in identifying the speakers. The transcripts are evidence just like any other evidence in this case. However, the wiretap recordings are the actual evidence of what was said and should you find it necessary during your deliberations I can arrange to have them played back to you while you follow along with the transcripts. The parties have stipulated that the transcripts accurately translate the conversation between the speakers in all material respects.

This court has previously warned against the dangers of the indiscriminate use of transcripts, noting that the "the jurors may . . . transform the transcript into independent evidence of the recorded statements." *United States v. Law*, 528 F.3d 888, 901 (D.C. Cir. 2008) (quoting *United States v. Holton*, 116 F.3d 1536, 1540 (D.C. Cir. 1997)). *Holton* held that "[t]he jury must be instructed that they should disregard anything in the transcript that they do not hear on the recording itself. Moreover, the court must ensure that the transcript is used only in conjunction with the tape recording." 116 F.3d at 1543.

But *Holton*'s general rule favoring the use of recordings over transcripts did not categorically prohibit the use of transcripts. Here, the recordings were in a foreign language and the jurors could only understand the evidence through the translated transcripts. It would be redundant to require the jury to go through the pretense of rehearing the recordings, when its real need was an ability to refer back to the transcripts. Emphasis and vocal inflection may of course be critical, but jurors dealing with calls made in a foreign language are likely to take the vast majority of their

understanding from the translations, turning to the recordings only for special issues.

Cano-Flores argues that the judge's statement that "[t]he transcripts are evidence just like any other evidence in this case" was error, emphasizing that certain inaccuracies in the transcripts had been established during the trial. But he doesn't point to any inaccuracies material enough to have affected the outcome. Furthermore, we agree with other circuits that when the tapes are in a foreign language, it generally makes little sense to say that accurate transcriptions do not qualify as evidence. Absent unusual circumstances, there was no error in instructing the jurors that they could "consider those transcripts like any other evidence during [their] deliberations." *United States v. Placensia*, 352 F.3d 1157, 1165 (8th Cir. 2003); see also *United States v. Franco*, 136 F.3d 622, 626 (9th Cir. 1998).

\* \* \*

Cano-Flores challenges three aspects of his sentencing, claiming that his 35-year imprisonment term is substantively unreasonable, that the court improperly calculated the $15 billion forfeiture, and that assessment of that forfeiture violates the Eighth Amendment's prohibition against excessive fines.

While the Sentencing Guidelines are advisory, the first step for the sentencing court is to calculate the range they prescribe. *Gall v. United States*, 552 U.S. 38, 49, 51 (2007). The district court determined (and Cano-Flores does not challenge) that the Guidelines recommended a sentence of life imprisonment. Explaining the actual 35-year sentence by reference to the factors named in 18 U.S.C. § 3553(a)(2), the court emphasized the enormity of the threat posed by cartels and the drug trade between Mexico and the United States, as

well as § 3553(a)(2)(B)'s directive to adequately deter such conduct. Nonetheless, the court imposed a below-Guidelines sentence in light of the need to avoid "unwarranted sentencing disparities between [Cano-Flores] and defendants found guilty of similar crimes."

When reviewing a sentencing court's application of the Guidelines to facts, we grant the court "due deference," which we have said lies "somewhere between *de novo* and 'clearly erroneous.'" *United States v. Kim*, 23 F.3d 513, 517 (D.C. Cir. 1994); see also 18 U.S.C. § 3742(e).

Cano-Flores argues that his sentence constituted too great a "trial penalty," severely punishing him for his decision to go to trial rather than accept a plea bargain, and thus violates 18 U.S.C. § 3553(a)(6)'s requirement that the court consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." He cites the sentences of a number of cartel members whose roles were greater than his but who, having pleaded guilty, received lesser sentences. His best but not altogether atypical example is the cartel's "supreme leader," Osiel Cardenas-Guillen, whom the judge in the Southern District of Texas sentenced to 25 years in prison.

The argument runs into two difficulties. First, the sentencing judge clearly took into account the need to avoid unwarranted disparities, and indeed offered that concern as the primary reason to give Cano-Flores a below-Guidelines sentence. Second, "[b]ecause it is well established that sentences that fall within the Guidelines range are entitled to a presumption of reasonableness, it is hard to imagine how we could find [a] below-Guidelines sentence[] to be unreasonably high." *United States v. Jones*, 744 F.3d 1362, 1368 (D.C. Cir. 2014) (internal citations and quotations omitted). In light of the deferential standard that we apply to sentencing

determinations—combined with the sentencing judge's explicit acknowledgment of the relevant factors and a below-Guidelines sentence—we conclude that Cano-Flores's sentence is not substantively unreasonable.

\* \* \*

The district judge ordered a $15 billion forfeiture against Cano-Flores pursuant to 21 U.S.C. § 853(a)(1). That provision reads:

(a) Property subject to criminal forfeiture

Any person convicted of a violation of this subchapter or subchapter II of this chapter punishable by imprisonment for more than one year shall forfeit to the United States, irrespective of any provision of State law—

(1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation;

The district court arrived at the $15 billion figure by relying on the attribution principles set out in *Pinkerton v. United States*, 328 U.S. 640 (1946), essentially accepting what the government claimed was a "conservative" interpretation of evidence on gross cartel proceeds that were reasonably foreseeable to Cano-Flores. The cartel employed tens of thousands of people, and Cano-Flores argues that to impose a forfeiture so calculated on him violates the Eighth Amendment's prohibition against excessive fines.

At oral argument we asked whether such an expansive approach to forfeiture was consistent with the statutory text:

Court: How do you get from the statute that refers to what a "person obtained" to assigning to the person $15 billion based on what the entire cartel obtained?

Government Counsel: Courts have held . . . in a drug conspiracy case, specifically, a defendant is jointly and severally liable for the reasonably foreseeable proceeds of a conspiracy, and . . . that's consistent with general conspiracy law, subject, of course, to an Eighth Amendment constraint . . . .

Oral Argument Recording at 44:30-45:30.

Although Cano-Flores did not raise the question whether § 853(a)(1) authorized a forfeiture based on the attribution principles of *Pinkerton*, we ordered supplemental briefing in order to determine whether a correct interpretation of the statute would allow us to avoid Cano-Flores's constitutional challenge. Order for Supplemental Briefing, May 13, 2015 (citing *U.S. National Bank of Oregon v. Independent Insurance Agents of America*, 508 U.S. 439, 445-48 (1993); *Meredith Corp. v. FCC*, 809 F.2d 863, 872 (D.C. Cir. 1987)). We now conclude that the calculation procedure employed by the district court was inconsistent with the language of § 853(a)(1), which in our view does not authorize imposition of a forfeiture based on the total revenues of a conspiracy simply because they may have been reasonably foreseeable.

We acknowledge at the outset that government counsel's summary of the views of the circuit courts that have spoken to the issue is essentially correct. Under both 21 U.S.C. § 853 and 18 U.S.C. § 1963, a similarly-worded forfeiture provision also enacted as part of the Comprehensive Forfeiture Act of 1984, courts have applied *Pinkerton* principles and characterized the resulting forfeiture calculation as one of "joint and several liability." See, e.g., *United States v. McHan*,

101 F.3d 1027, 1042-43 (4th Cir. 1996) (noting that the court "generally construe[s] the drug and RICO forfeiture statutes similarly"); *United States v. Edwards*, 303 F.3d 606, 643-44 (5th Cir. 2002); *United States v. Corrado*, 227 F.3d 543, 553 (6th Cir. 2000); *United States v. Pitt*, 193 F.3d 751, 765 (3d. Cir. 1999); *United States v. Simmons*, 154 F.3d 765, 769 (8th Cir. 1998); *United States v. Hurley*, 63 F.3d 1, 22 (1st Cir. 1995); *United States v. Masters*, 924 F.2d 1362, 1369 (7th Cir. 1991); *United States v. Benevento*, 663 F. Supp. 1115, 1118 (S.D.N.Y. 1987), *aff'd*, 836 F.2d 129 (2d Cir. 1988) (expressly adopting the district court opinion); *United States v. Caporale*, 806 F.2d 1487, 1506 (11th Cir. 1986). We respectfully disagree, reading the statutory language as providing for forfeiture *only* of amounts "obtained" by the defendant on whom the forfeiture is imposed.

We begin our analysis with the statutory text itself, which appears, on its face, to embrace only property that a defendant has "obtained." The government's dispute of that position, to the extent it goes beyond stating that other courts have applied *Pinkerton*, appears to rest on the word "indirectly," arguing that a co-conspirator "'indirectly' obtains proceeds [that are] foreseeably acquired by his co-conspirators in furtherance of the conspiracy." Gov. Supp. Brief at 6.

But the government's view reads the word "obtained" out of the statute. In ordinary English a person cannot be said to have "obtained" an item of property merely because *someone else* (even someone else in cahoots with the defendant) foreseeably obtained it. And there is no need to read "obtained" in such a strained way, given that "indirectly" can be meaningfully understood in ways completely consistent with giving "obtained" its ordinary meaning. Most obviously, "indirect" naturally covers any situation where funds are transferred by a victim (or purchaser) to a defendant through an intermediary. That understanding reconciles "indirectly"

and "obtained" by giving power to the word "indirect" while still encompassing only funds that actually *reach* the defendant. While it might be argued that the final stage of the transaction is the only one which "counts," so that any such multi-party transaction would include one "direct" step (the last), such a formulation drains "indirectly" of its most obvious and natural meanings.

There are also cases where the flow of funds is a good deal more subtle. For example, an employee engineering a fraud for his or her firm may receive increased compensation as an indirect benefit of the fraud. See *SEC v. Stoker*, 865 F. Supp. 2d 457, 463-64 (S.D.N.Y. 2012) (finding that the complaint adequately pled that the defendant "personally obtained money indirectly" after a "doubling of his yearly bonus" which was plausibly "at least partly the fruit of his fraud").

"Indirectly" might also be seen as embracing property received by persons or entities that are under the defendant's control (such as a closely held corporation, or an employee or other subordinate of the defendant), or property applied to the benefit of persons for whom that defendant has a legal or moral obligation of support (such as his children). Thus, in *United States v. Peters*, 732 F.3d 93, 102-04 (2d Cir. 2013), the Second Circuit held that, under a similarly worded forfeiture provision, an individual defendant indirectly obtained proceeds received by a corporation 98% owned by the defendant and his wife. See also *United States v. Stolee*, 172 F.3d 630, 631 (8th Cir. 1999) (applying the bank fraud enhancement from the Sentencing Guidelines and holding that the defendant indirectly obtained funds deposited into a corporation solely owned by the defendant).

In all these cases the defendant would normally be seen, as a matter of ordinary language, as having *obtained* the

amount in question. Forfeiture amounts calculated under the government's view, by contrast, may consist almost entirely of amounts that the defendant has never obtained.

The Sentencing Guidelines further confirm the oddity of the government's assumption by adopting rules under which proceeds "indirectly" obtained by a violator refer exclusively to proceeds actually obtained by him *individually*. For example, § 2B4.1 of the Guidelines, "Bribery in Procurement of Bank Loan and Other Commercial Bribery," provides for a two-level increase if "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense . . . ." § 2B4.1(b)(2)(A). The notes explain that § 2B4.1(b)(2)(A) encompasses all property obtained "directly or indirectly" and also that the defendant is deemed to have "derived" *only* sums received "individually":

> (A)    In General.   For purposes of subsection (b)(2)(A), the defendant shall be considered to have derived more than $1,000,000 in gross receipts if the gross receipts to the defendant *individually*, *rather than to all participants*, exceeded $1,000,000.

> (B)    Definition.  "Gross receipts from the offense" includes all property, real or personal, tangible or intangible, which *is obtained directly or indirectly as a result of such offense*.  See 18 U.S.C. § 982(a)(4).

USSG § 2B4.1 Application Note 4 (emphasis added); see also USSG § 2B1.1 (treating "Theft, Embezzlement, Receipt of Stolen Property, Property Destruction, and Offense Involving Fraud or Deceit" similarly).  Thus the Commission plainly recognizes that there is no inconsistency in saying that, under language clearly imputing to a person property received "indirectly," the court is to exclude property received by other

people with whom he or she is in cahoots, and to include only property received by the defendant in question.

We now turn to the reasoning of the decisions that, as we noted, adopt a view equivalent to the government's. First, courts using the concept of joint and several liability often rely on 21 U.S.C. § 853(o)'s instruction to construe the provisions in the statute "liberally" in order "to effectuate [the statute's] remedial purposes." See *Benevento*, 663 F. Supp. at 1118; see also *Simmons*, 154 F.3d at 771; *McHan*, 101 F.3d at 1043; *United States v. Saccoccia*, 823 F. Supp. 994, 1003 (D.R.I. 1993).

We put aside for a moment some general problems with reliance on the "be liberally construed" clause and focus instead on the remedial purposes of the legislation. See *Caporale*, 806 F.2d at 1507 ("[T]he legislative history of the forfeiture provision indicate that joint and several liability is not only consistent with the statutory scheme, but in some cases will be necessary to achieve the aims of the legislation."). The essence of the theory appears to be that since Congress undoubtedly wanted to improve forced disgorgement as a tool for dissuading people from embarking on drug (or RICO) crimes, Congress sought basically to *expand* the amounts forfeitable, and application of *Pinkerton* has that effect. There are at least two flaws in the reasoning.

First, neither the statutory language nor the legislative history suggests any such general expansive purpose. The Senate Report explained: "For the most part, [these] forfeiture amendments do not focus on significant expansion of the scope of property subject to forfeiture . . . [i]nstead, they focus primarily on improving the procedures applicable in forfeiture cases." S. Rep. No. 98-225, at 192 (Sept. 14, 1983). Instead of intending some sort of generalized expansion, Congress appeared to be intent on specific improvements aimed at

preventing transfer or concealment of assets before conviction, *id*. at 195, and at creating (in the drug forfeiture sections applicable here) a more efficient forfeiture process which would no longer require a wasteful "separate civil forfeiture proceeding[] against *property of the defendant . . . .*" *Id*. at 210 (emphasis added).

Second, even if Congress explicitly asserts a particular purpose, the courts do not assume that it intended to pursue that purpose to the exclusion of all others. See, e.g., *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) ("[N]o legislation pursues its purposes at all costs."). Here, for example, there is nothing to suggest that Congress intended to rank forfeiture maximization above all normal principles, such as the idea that the punishment should *fit* the crime.

Reliance on the "be liberally construed" provision also presents more general problems. First, the Supreme Court has been clear that identical language (the "provisions of this title shall be liberally construed to effectuate its remedial purposes") cannot be used to apply a statute "to new purposes that Congress never intended"; the instruction "only serves as an aid for resolving an ambiguity; it is not to be used to beget one." *Reves v. Ernst & Young*, 507 U.S. 170, 183-84 (1993) (internal quotations and citation omitted).

Second, even if the statute were ambiguous in the sense of *permitting* the government's construction, "[t]he rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008). In the context of the RICO forfeiture provision, which has both civil and criminal application, we held that any ambiguity in the statute would need to be narrowly construed, as the rule of lenity prevails over the explicit instruction to construe the statute liberally.

*Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*, 913 F.2d 948, 955-56 (D.C. Cir. 1990). (A footnote in *Reves* suggests disagreement with a different aspect of *Yellow Bus Lines*, 507 U.S. at 179 n.4, but doesn't address this principle.) There may be little clash here. The rule of lenity, which "applies to sentencing as well as substantive provisions," *United States v. Batchelder*, 442 U.S. 114, 121 (1979), requires Congress to speak clearly so that courts need "not play the part of a mindreader" "[w]hen interpreting a criminal statute." *Santos*, 553 U.S. at 515. Whatever the force of "liberally construed," it cannot support interpretations that require us to play mindreader to Congress, which did not manifest any decision, so far as we can tell (much less a clear one), that forfeitures be calculated on a theory of joint and several liability.

Finally, in addition to the rule of lenity, the canon of constitutional avoidance requires that if one of two linguistically permissible interpretations raises "serious constitutional problems" and the other does not, we are to choose the second unless it is "plainly contrary to the intent of Congress." See *Solid Waste Agency of N. Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159, 173 (2001) (quoting *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 575 (1988)). A forfeiture equal to a cartel's gross take of $15 billion, imposed on a mid-level manager such as Cano-Flores (or even a trivial courier) within a conspiracy—a result which appears to be commanded under the government's interpretation of § 853(a)(1)—poses serious Eighth Amendment concerns. See *United States v. Bajakajian*, 524 U.S. 321, 334-44 (1998) (outlining inquiry for determining whether a fine is unconstitutionally excessive). Even if the government's view of the statute were a plausible interpretation—which we question—the canon counsels us to go with the narrower reading.

The final theme invoked by our sister circuits is the thought that imposition of vicarious liability under § 853 "resonates with established criminal law principles." *McHan*, 101 F.3d at 1043. Some courts have argued that the imposition of joint and several liability in forfeiture is "even less theoretically problematic than vicarious liability for a substantive conviction might be because it goes only to the penalty imposed rather than to the individual's criminal liability." *Caporale*, 806 F.2d at 1508.

But vicarious liability's supposed "resonance" with *Pinkerton* seems a woefully inadequate reason for disregarding the normal meaning of the word "obtained." First, as Congress made no mention of the case or the principle in either the statute or in the legislative history, the fact that it is and was "established" would seem to *weaken* the case for its implicit incorporation.

Further, *Pinkerton*, even on its own terms, is a doctrine which speaks only to a defendant's substantive liability—not to the consequences of such liability. Applying *Pinkerton* of course tends to increase consequences (i.e., imprisonment) for criminal defendants, but applying vicarious liability principles to forfeiture under § 853(a)(1) yields a growth in forfeitures that doesn't parallel the growth in imprisonment lengths. At least in the case of drug convictions, the Sentencing Guidelines do not link imprisonment with drug quantities by a linear formula under which imprisonment time increases in direct proportion to increases in the quantity of drugs attributed to the defendant. Although the ranges of recommended imprisonments increase, they do so at generally declining rates. For example, a defendant who possessed (with intent to distribute) 100 grams of cocaine, and to whom 1900 additional grams are attributed under *Pinkerton* (a 20-fold increase), would be subject to only a three-fold increase in minimum imprisonment (63 months compared to 21

months). See Drug Quantity Table, USSG § 2D1.1 (outlining a "base level" of 16 for possession with intent to distribute of 100-200 grams of cocaine, and a base level of 26 for possession with intent to distribute of 2-3.5 kilograms of cocaine). In contrast, application of *Pinkerton* to the computation of forfeiture would increase a defendant's monetary liability in relation to quantities handled by *the entire conspiracy* at a steady 1:1 rate—a much larger increment in monetary punishment than the Guidelines-directed increment in imprisonment. While imprisonment and forfeiture are both subject to ceilings (life for the first, and maximum lifetime wealth for the second), calculating forfeitures via the joint and several theory does not truly align the growth paths of the two types of criminal consequences.

Moreover, the language of "joint and several liability" is derived from torts, but the courts invoking it have not deeply considered where there is a sound analogy between forfeiture and tort law. We doubt there is one. In torts, the doctrine of joint and several liability rests on a serious policy rationale: the judgment that it is better that the risk of an insolvent co-defendant should fall on a partially guilty defendant than on a completely innocent victim. See Paul Bargren, *Joint and Several Liability: Protection for Plaintiffs*, 1994 Wis. L. Rev. 453, 464 (1994). This suggests that the tort analogy might well apply to *restitution* in a criminal case, and 18 U.S.C. § 3664(h) does indeed authorize (but does not require) application of joint and several liability as a means of protecting victims. See Jonathan R. Hornok, *A Right to Contribution and Federal Restitution Orders*, 2013 Utah L. Rev. 661, 678 (discussing joint and several liability under § 3664(h)). But the reasoning doesn't extend to forfeitures, which are collected by the government. Moreover, in the normal tort case a defendant who is jointly and severally liable has at least a chance of securing contribution from co-defendants, see *id*. at 670-71, but there appears to be no

suggestion by any court imposing joint and several liability that defendants would have a right of contribution among themselves.

Because we conclude that the "joint and several" calculation procedure erroneously included amounts not obtained by Cano-Flores, we need not reach any of Cano-Flores's other arguments against the forfeiture imposed, including his constitutional claim and his dispute of specific aspects of the calculation. We vacate the $15 billion forfeiture assessment against him and remand to the district court for determination of the proper amount to be forfeited under § 853(a)(1). We otherwise affirm the judgment of the district court.

*So ordered.*