[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 18-12569

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

MARIO DEMITRIC STOWERS,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 2:16-cr-00010-RWS-JCF-8

_____

2                    Opinion of the Court                    18-12569

_____

No. 18-15289

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

CARLOS SANCHEZ,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 2:16-cr-00010-RWS-JCF-5

_____

_____

No. 18-14958

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

18-12569               Opinion of the Court                3

*versus*

THURSTON CHADRICK MARTIN,
a.k.a. Thurston Chadwick Martin,

Defendant-Appellant.

————————————

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 2:16-cr-00009-RWS-JCF-6

————————————

————————————

No. 18-14967

————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

LEONARDO STEEPLES,

Defendant-Appellant.

4                    Opinion of the Court                    18-12569

_____

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 2:16-cr-00009-RWS-JCF-5

_____


_____

No. 19-10703

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

HORACE MAYFIELD,

Defendant-Appellant.


_____

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket Nos. 2:16-cr-00009-RWS-JCF-1,
2:16-cr-00010-RWS-JCF-1

_____

18-12569                Opinion of the Court                5

_____

No. 19-10704

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

HORACE MAYFIELD,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket Nos. 2:16-cr-00010-RWS-JCF-1,
2:16-cr-00009-RWS-JCF-1

_____

_____

No. 19-10804

_____

6                    Opinion of the Court                    18-12569

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

GUSTAVO MELENDEZ,

Defendant-Appellant.

_____

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 2:16-cr-00010-RWS-JCF-4

_____


_____

No. 19-10805

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

18-12569                Opinion of the Court                7

STEPHENS EDWIN IVESTER,

Defendant- Appellant.

_____

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 2:16-cr-00009-RWS-JCF-3

_____

_____

No. 19-12657

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

MARVIN JUNIOR TEASLEY,

Defendant-Appellant.

8                     Opinion of the Court                     18-12569

_____

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 2:16-cr-00009-RWS-JCF-9

_____


_____

No. 19-13566

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

NATHAN ANTONIO HOWARD,

Defendant-Appellant.


_____

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 2:16-cr-00009-RWS-JCF-2

_____

Before JORDAN, BRASHER, and ANDERSON, Circuit Judges.

18-12569                Opinion of the Court                9

BRASHER, Circuit Judge:

These consolidated appeals require us to answer several questions of first impression about Title III of the Omnibus Crime Control and Safe Streets Act, "which regulates the interception of wire, oral, and electronic communications." *United States v. Ojeda Rios*, 495 U.S. 257, 259 (1990) (citing 18 U.S.C. § 2510 *et seq.*). While investigating a suspected drug trafficking conspiracy, a Georgia Bureau of Investigation agent secured a wiretap authorization order from a state judge. The wiretap ultimately implicated the following nine people in the conspiracy: Mario Stowers, Thurston Martin, Leonardo Steeples, Carlos Sanchez, Horace Mayfield, Gustavo Melendez, Stephens Ivester, Marvin Teasley, and Nathan Howard. When federal authorities prosecuted them based on this state-gathered evidence, the defendants asked the district court to suppress it. The district court denied their motions, the defendants pleaded guilty to federal drug crimes, and each defendant expressly reserved his suppression arguments for appeal.[1]

The defendants make three arguments that the district court should have suppressed this evidence. First, they argue that the

---

[1] Although Mayfield also seeks to appeal his below-guidelines sentence, that argument is barred by his appeal waiver. Mayfield's plea agreement waived the right to appeal a below-guidelines sentence, he reviewed the plea agreement with his attorney, and the district court properly found at the change-of-plea hearing that Mayfield had knowingly, voluntarily, and intelligently pleaded guilty and understood the consequences. Accordingly, we do not address Mayfield's challenge to his sentence.

state judge did not correctly seal the wiretap recordings as required under Title III. Second, they argue that the government impermissibly delayed sealing the wiretap recordings without providing a satisfactory explanation for that delay. And third, they argue that the state court's wiretap authorization order exceeded its jurisdiction. The government responds that the recordings were validly sealed, that it has satisfactorily explained its delay in sealing, and that the state court did not exceed its jurisdiction. We agree with the government and affirm.

## I.    BACKGROUND

### A.    *Factual Background*

Georgia Bureau of Investigation Agent Clay Bridges led a state investigation into suspected drug crimes. Before applying for a state wiretap, Agent Bridges met with an assistant United States attorney to discuss the investigation becoming a federal case. But at that point, the federal government declined involvement, so Agent Bridges and the district attorney sought state wiretap authorization. Agent Bridges had worked on several wiretap investigations during his twenty-five years of law enforcement, but he had never been the affiant or prepared the application.

Because this was his first time preparing the application, Agent Bridges reviewed the state wiretap law and sought guidance from his superiors, asking for "all the documentation" that they had on obtaining a wiretap. His superiors talked to him about obtaining a wiretap and sent him various materials. The materials

included, most importantly, several "go-bys"—or applications, affidavits, and orders from past cases that judges and attorneys had approved and that officers had successfully used. At least some of those "go-by" orders allowed for the recordings to be returned and sealed ten days after the wiretap terminated.

Agent Bridges discussed the language of the "go-bys" with his superior and then used that language to draft the application, affidavit, and order for the first wiretap. His draft order authorized interception for thirty days and required that the recordings be returned within forty days of the order. He sent the drafts to the district attorney, who edited them. Then, together, they presented the application, affidavit, and order to the judge. The judge scrutinized the filings and asked Agent Bridges to change the language in the order to clarify that the recordings had to be returned within ten days of the last interception, not just within forty days of the order. Agent Bridges made that change, and the judge signed the order with the language: "Let return hereof and report as required by law be made before me within forty (40) days of date hereof or ten (10) days from the date of the last interception, whichever is earlier." The authorization also stated that all applications, affidavits, orders, reports, court reporter's notes, tapes, and disks, "and all other matters filed or received herein shall remain sealed until further Order of this Court … [and] remain in the custody of the Clerk."

That same process happened four more times—three times for additional wiretaps and once to extend the first wiretap. Each

time, Agent Bridges prepared the application, affidavit, and order. Each time, the district attorney edited them. And each time, the judge reviewed them and signed the order. All of the orders contained the ten-day-to-return language, and all of the orders were labeled "*__UNDER SEAL__*." Each also stated that the communications would be intercepted at "a designated law enforcement listening post" and that "based on the fact [that the target] is likely to travel out of Georgia during the course of this investigation, the State is authorized to continue to monitor and electronically intercept transmissions to and from the target telephone during any out of state travels."

Based on the language in those five orders plus the examples that he had reviewed, Agent Bridges believed that he would have ten days from the last interception to return the recordings and that they would be sealed when returned. Agent Bridges and other Georgia law enforcement officers set up a listening post in Georgia to monitor the calls in real time, and the calls were recorded and stored in a separate, secure building to which Agent Bridges and the others did not have access. Indeed, to gain access to the building, a person had to display law enforcement identification and then be admitted by an employee with a "prox" card. To get into the server room where the original recordings were stored, a person would have to pass through three prox-card doors. Only three employees had access to the server room; no one could be in the server room without one of those three employees present. And after entering the room, to access the recordings, a person would

need a system account, username, and password, and a separate username and password for the program where the original recordings were stored. Only the three employees with access to the room had usernames; none of them were Agent Bridges or the other officers working on the wiretaps in this case.

About a month-and-a-half after starting interceptions, the agents executed fifteen to twenty search warrants and approximately thirty state arrest warrants. Among those arrested were the two defendants who owned the four targeted phones. Shortly after those defendants were arrested, the agents terminated all four wiretaps.

Agent Bridges planned to return the recordings for sealing "once [they] had developed discovery copies, once [they] had perfected the transcripts of certain calls, [and] once [they] had perfected the synopses of certain calls and reviewed them." To get the work done within ten days, Agent Bridges and a state sergeant assigned to the task force worked fourteen-hour days and weekends. At one point, they called in extra agents because they were "falling behind." Both the sergeant and an FBI agent who helped with the perfection understood from the judge's order that they had ten days (and only ten days) to return the original recordings. The sergeant even described ten days as "standard."

They finished with the wiretaps about eight days after the last interception. During those eight days, none of those agents had the ability to access the original recordings, and there was not "[a]ny ability for anybody to tamper with those recordings in any

way" during those eight days. On the eighth day, the sergeant drove from the listening post to the secure storage site and picked up the original recordings. To do so, he met with one of the three employees who could access the recordings. That employee went into the server room, logged into the system with his credentials, retrieved the recordings, and gave them to the sergeant, who signed the evidence receipt. None of the original recordings had been accessed from the secure server room before that day.

The sergeant delivered the recordings to Agent Bridges that same day. Agent Bridges signed the evidence receipt, put the recordings in a tamper-proof evidence bag, and placed the bag in a locked evidence vault in his state-issued Suburban. Agent Bridges then informed the district attorney that he had received the recordings and scheduled a meeting with the judge for the next day. The recordings stayed locked in the Suburban's vault that night. The back of the Suburban had a cage around it. The vault was in that cage. It had two drawers, each with a combination lock. And the Suburban had an alarm, which did not go off that night.

The following day, Agent Bridges, the district attorney, and an assistant district attorney met with the judge, and Agent Bridges "presented [the recordings] to [the judge], explained that they were the original audio recordings from the wire, … explained to him that they must remain under seal; that they couldn't come back out of seal, … told [the judge] that [Agent Bridges] would be sealing them in … a tamper-proof evidence bag and requested that [the judge] initial the bag itself." Next, Agent Bridges sealed the

recordings in the tamper-proof evidence bag in front of the judge, and both of them initialed the seal. The judge then instructed Agent Bridges to take the evidence bag to the clerks' office where it would remain in the clerk of court's custody under seal.

During that same meeting, the judge also signed the returns, which Agent Bridges had prepared and which the district attorney had reviewed and edited. Those returns verified that the recordings were each "preserved on one (1) unedited DVD-RAM" and were "delivered in the custody of [the] Court." During the suppression proceedings, the judge testified that once he had initialed the physical seal, he understood that the wiretap recordings were sealed and "that the public would not have access at least to the original recordings."

After sealing the recordings, Agent Bridges immediately took the evidence bag to the clerk's office. Agent Bridges told the clerk of court that the bag contained the original recordings and that "under the original order to seal the evidence," they were not to be unsealed. The clerk took custody of the recordings, signed the evidence receipt, and wrote in the "purpose of change of custody" column: "Sealed in Stephens County Clerk of Court." At the suppression hearing, the clerk testified that the tamper-proof evidence bag holding the recordings "ha[d] stayed with [him] the entire time because [it] ha[d] not been unsealed." Additionally, both he and the judge testified that the evidence bag "ha[d] never been opened" after being sealed. The clerk explained that "when you

open these, you can tell they have been opened and you can see [this seal] has never been broken."

### B.    Procedural Background

Each defendant was charged with conspiring to traffic cocaine, methamphetamine, or both. Because the wiretap evidence was crucial to all of their cases, the defendants filed motions to suppress the wiretap evidence based on alleged violations of Title III, which regulates wiretaps. *See United States v. Ojeda Rios*, 495 U.S. 257, 259 (1990). The magistrate judge held a two-day hearing on whether the wiretaps violated Title III's sealing requirements found at 18 U.S.C. § 2518(8)(a). After receiving post-hearing briefing, the magistrate judge issued a Report and Recommendation that recommended denying the defendants' motions to suppress.

The magistrate judge's order reasoned that Section 2518(8)(a) of Title III does not require a separate sealing order. Additionally, it held that the sealing here complied with Section 2518(8)(a) because Agent Bridges had made the original recordings available to the judge and then sealed them "under his direction." It also held that the government had satisfactorily explained any delay in sealing. It specifically found that Agent Bridges's proffered reasons for the sealing delay—that he believed that he had ten days to return the recordings and that he had to finish perfecting, copying, and producing transcripts of the recordings before returning them—were "the actual reasons for the delay, i.e., he believed and relied on the reasons he testified to at the hearing."

It found those beliefs reasonable because Agent Bridges had relied on the judge's orders, which the district attorney had reviewed, and on previous orders that other judges and attorneys had approved and which other officers had successfully used. It also found that the previous "go-bys" that Agent Bridges had reviewed included the ten-day language and that Agent Bridges had talked to his supervisors and the prosecutor about preparing the application. Further, it found that the delay was not lengthy, that there was no evidence of bad faith or tactical advantage, and that the recordings had not been altered. Finally, it held that the state court did not exceed its jurisdiction in authorizing the wiretaps because the calls were intercepted at a listening post in Georgia.

The district court adopted the R&R as the opinion of the court and made a few additions. The district court reasserted the magistrate judge's holding that the "receipt and sealing of the recordings was not defective." And it found that no one had accessed the recordings since they had been sealed. In fact, the district court found that the recordings were still with "the Clerk in a sealed bag with an unbroken seal." The district court concluded that suppression was not warranted here because an agent could "reasonably rely upon" a judge's signed order.

The defendants then conditionally pleaded guilty, waiving their right to appeal matters other than the denial of the motion to suppress the wiretap evidence. The defendants timely appealed, and the appeals were consolidated. The defendants filed multiple briefs raising a variety of arguments. Although we generally "limit

each defendant's appeal to the issues raised in his brief," *United States v. Gray*, 626 F.2d 494, 497 (5th Cir. 1980), we proceed in this case as if all the defendants have raised all the arguments raised in any brief. *See United States v. McGarity*, 669 F.3d 1218, 1238 n.23 (11th Cir. 2012) (citing *United States v. Gray*, 626 F.2d 494, 497 (5th Cir. 1980)); *United States v. Gari*, 572 F.3d 1352, 1361 (11th Cir. 2009) (internal quotation marks omitted); *United States v. Rivera Pedin*, 861 F.2d 1522, 1526 n.9 (11th Cir. 1988)).

## II.    STANDARD OF REVIEW

A district court's ruling on "a motion to suppress evidence is reviewed as a mixed question of law and fact, with the rulings of law reviewed *de novo* and the findings of fact reviewed for clear error, in the light most favorable to the prevailing party." *United States v. De La Cruz Suarez*, 601 F.3d 1202, 1213 (11th Cir. 2010). We have never expressly addressed what standard of review governs when we review a district court's satisfactory-explanation determination. We now hold that the same mixed standard of review that applies to motions to suppress also applies to whether the government has provided a satisfactory explanation for its delay in sealing. *See, e.g., United States v. Burgos-Montes*, 786 F.3d 92, 104 (1st Cir. 2015). *But see United States v. Coney*, 407 F.3d 871, 874 (7th Cir. 2005). That standard applies because the satisfactory-explanation determination requires both factual and legal conclusions. *See United States v. Sawyers*, 963 F.2d 157, 159 (8th Cir. 1992). For instance, relevant factual findings include whether the government tampered with evidence, the reasons for the delay, the

"genuine[ness]" of the government's belief, and whether the government acted in good faith; those are reviewed for clear error. *See United States v. Maxwell*, 25 F.3d 1389, 1393–94 (8th Cir. 1994); *United States v. Maldonado-Rivera*, 922 F.2d 934, 951–52 (2d Cir. 1990). Conversely, whether the explanation is ultimately satisfactory is a legal determination reviewed *de novo. See, e.g., United States v. Pedroni*, 958 F.2d 262, 265 (9th Cir. 1992).

## III.    DISCUSSION

Title III of the Omnibus Crime Control and Safe Streets Act "regulates the interception of wire, oral, and electronic communications." *United States v. Ojeda Rios*, 495 U.S. 257, 259 (1990). Generally, evidence gathered from interceptions that violate this statute must be suppressed. 18 U.S.C. § 2518(10)(a). The defendants argue that the wiretap interceptions in this case violated Title III in three different ways. First, they argue that Title III requires that the judge issue a separate, written sealing order after the recordings are returned, which the judge did not do here. Second, they argue that the government improperly delayed sealing and failed to provide a satisfactory explanation for that delay. Third, they argue that the state court exceeded its jurisdiction in authorizing the interception of calls made outside of the state, which they allege makes the wiretap order facially overbroad. But Title III does not require a separate sealing order; the government has provided a satisfactory explanation for any delay in sealing; and the state court did not exceed its jurisdiction in authorizing the wiretaps. Accordingly, we affirm the district court's denial of the defendants' motions to suppress.

### A.    Sealing Order

Title III, Section 2518(8)(a), requires that wiretap recordings "be made available to the judge issuing [the authorization] order and sealed under his directions." The defendants argue that the recordings were never properly sealed both because the judge did not issue a separate, written sealing order after receiving the recordings and because the government "maintained access" to the original recordings after sealing. We disagree.

The state judge properly sealed the wiretap recordings. Agent Bridges and the district attorney took the four original recordings to the judge in a tamper-proof evidence bag, Agent Bridges placed a seal on the tamper-proof evidence bag in front of the judge, and both the judge and Agent Bridges initialed the bag. The judge directed Agent Bridges to place the sealed recordings in the custody of the clerk, and Agent Bridges did so, taking the sealed, initialed evidence bag to the clerk. Agent Bridges and the clerk both signed the evidence receipt and noted in the "purpose of change of custody" column: "Sealed in Stephens County Clerk of Court." The clerk retained custody of the evidence, and no one has accessed the recordings since they were sealed. Indeed, at the time of this writing, the seal is still unbroken.

The defendants assert without any support that "the recordings were later accessed" and that "[t]he district attorney was actually the one to physically 'unseal' the recordings." But the district court dismissed those accusations based on the evidence

introduced at the suppression hearing. It found that "the recordings were retained by the Clerk in a sealed bag with an unbroken seal" so they were not altered after being sealed. And the record supports that finding. The clerk testified that since the day it was sealed, the tamper-proof evidence bag holding the recordings "ha[d] stayed with [him] the entire time" and had "not been unsealed" or accessed by anyone. If that left any doubt, he further explained that "when you open these, you can tell they have been opened and you can see [this seal] has never been broken." Indeed, both he and the sealing judge testified that the bag that had been physically sealed under the judge's directions "ha[d] never been opened."

That is enough to satisfy Section 2518(8)(a)'s requirements for sealing. "Other than gathering the tapes, putting them in boxes and taking the tapes to the supervising judge," there are "no other necessary steps to sealing." See *United States v. Carson*, 969 F.2d 1480, 1489 (3d Cir. 1992). Nothing in the text of the statute requires a separate, written sealing order. See *United States v. Diana*, 605 F.2d 1307, 1311, 1316 (4th Cir. 1979) (finding an "oral sealing order" sufficient when "formal sealing" in accordance with the district court's instructions also occurred). Here, the recordings were "made available to the [authorizing] judge" and "sealed under his directions." No one accessed them after they were physically sealed. The recordings were, and are, sealed in compliance with the statute.

### B.    Satisfactory Explanation

Not only does Section 2518(8)(a) describe *how* wiretap recordings must be sealed, it also mandates *when* they must be sealed. Specifically, it requires that the recordings be sealed "[i]mmediately upon the expiration of the period of the order, or extensions thereof." 18 U.S.C. § 2518(8)(a). We have held that recordings are sealed "immediately" if they are sealed one or two days after the wiretap order expires. *United States v. Matthews*, 431 F.3d 1296, 1307 (11th Cir. 2005). We explained that "[i]f we interpreted 'immediately' to mean anything less than one or two days, we would essentially transform the statute into a requirement that the Government seal the recordings *before,* rather than 'immediately upon,' the order's expiration." *Id.* Apart from this two-day safe harbor, whether the government has "immediately" presented a wiretap recording to be sealed by a judge will depend on the circumstances.

Here, one could argue that the recordings were sealed immediately. The statute puts judicial officers—not law enforcement—in charge of sealing wiretap recordings, which necessarily gives authorizing judges some control over the deadline for sealing. *See* 18 U.S.C. § 2518(8)(a) (requiring that the recordings be "sealed under [the judge's] directions"). In many cases, the authorizing judge will not specify when recordings should be returned for sealing. But, in this case, the authorizing judge's wiretap order required the agents to return the wiretap recordings within ten days of the last interception, and the agents met that deadline. As our

sister circuits have explained, this kind of procedure likely satisfies the immediacy requirement because it serves the central "purpose of the statute, that recorded confidences be handled under direction of the court." *See United States v. McGuire*, 307 F.3d 1192, 1203 & n.10 (9th Cir. 2002) ("[If] the issuing court … *directs* that final sealing shall occur in the future, and the government complies with that direction," then "[t]here would be no 'delay' in sealing … under Title III."); *United States v. Blandford*, 33 F.3d 685, 706–07 (6th Cir. 1994) (finding no sealing delay because the tapes had been sealed within the thirty days allotted by the authorizing order); *cf. Matthews*, 431 F.3d at 1307 (noting that sealing need not occur under the statute until the "expiration of the period of the order").

Nonetheless, the parties litigated the immediacy issue based on the assumption that these recordings were not returned "immediately." So we, too, will assume that the recordings were returned late. The statute states that a delay in sealing should be excused if the government provides a "satisfactory explanation" for the delay. *Ojeda Rios*, 495 U.S. at 262–63; 18 U.S.C. § 2518(8)(a). A "satisfactory explanation" must be more than a reason for the delay and "proof of nontampering." *Ojeda Rios*, 495 U.S. at 264–65. Instead, the government must "explain not only why a delay occurred but also why it is excusable." *Id.* at 265.

The government gave three related reasons for the delay. One, the government followed the judge's order, which established a ten-day return period. Two, the government independently thought that ten days was the correct period because

previous judge-approved orders had included the ten-day period. Three, the government thought that it had to finish making all the transcripts and copies of the recordings before returning the originals.

To evaluate whether an explanation is "satisfactory" and whether a delay is "excusable," we first assess two threshold requirements that are necessary, but not sufficient, to establish that an explanation is satisfactory. One, we must assess whether "the integrity of the recording[s] was preserved," *United States v. Suarez*, 906 F.2d 977, 982 (4th Cir. 1990), meaning that there was no tampering during the period of delay. *See United States v. Rodrigues*, 850 F.3d 1, 11 (1st Cir. 2017); *United States v. Maldonado-Rivera*, 922 F.2d 934, 950 (2d Cir. 1990); *United States v. Bansal*, 663 F.3d 634, 653 (3d Cir. 2011); *United States v. Wilkinson*, 53 F.3d 757, 760 (6th Cir. 1995); *Coney*, 407 F.3d at 875; *United States v. Cline*, 349 F.3d 1276, 1284 (10th Cir. 2003). And two, we decide whether the government has acted in good faith. *See Rodrigues*, 850 F.3d at 11; *Bansal*, 663 F.3d at 653; *Cline*, 349 F.3d at 1284. That means that its proffered reasons must be its actual reasons, *Bansal*, 663 F.3d at 652; *Coney*, 407 F.3d at 875, and it must have relied on them at the suppression hearing. *Ojeda Rios*, 495 U.S. at 267 ("[T]hat explanation is not 'satisfactory' within the meaning of the statute unless it was relied on at the suppression hearing to explain the sealing delays."). It also means that any delay-causing mistake must have been an honest one. *See Suarez*, 906 F.2d at 982; *Coney*, 407 F.3d at 875.

Here, neither of the two threshold requirements are seriously disputed.

First, there is no reasonable argument that the tapes were tampered with before they were sealed. The district court found that there was "no evidence that the recordings were altered," pointing out that the recordings remained on a secured server in a secure building until the day before they were sealed and that during the one day outside of the secure building, they were locked in a vault in Agent Bridges's state-issued vehicle. The record supports that finding. The administrator of the system that recorded and stored the original recordings—and one of only three people who were able to access them—testified that there was not "[a]ny ability for anybody to tamper with those recordings in any way" during the eight days after the wiretap ended.

To raise an inference of potential tampering, the defendants assert that the "government had unilateral control over the five sealed envelopes at the Clerk's office which were later opened upon direction from the District Attorney," and that "the discs were kept in Agent Bridges' car while it was parked outside of his house." But the first assertion—besides being false (as explained above)—is irrelevant. Even if there were, as the defendants argue, the "opportunit[y] for tampering" after the recordings were sealed and in the clerk's control, that says nothing about the integrity of the recordings during the alleged delay. As for the second assertion, it is factually true, but legally insufficient. After receiving the recordings from the secure servers, Agent Bridges put them in a

tamper-proof evidence bag and stored the bag in a locked evidence vault in the back of his state-issued Suburban until he could meet with the judge to seal them the following day. Nothing suggests that the recordings were touched after being placed in the vault. The district court found that the tapes were not altered and that finding is amply supported by the record.

Second, the district court found that the government's actions were not in bad faith. Specifically, the district court found that the government's proffered reasons for the sealing delay were "the actual reasons for the delay, i.e., [Agent Bridges] believed and relied on the reasons he testified to at the hearing." It further found that the delay resulted from Agent Bridges's "good faith mistaken belief" that he had ten days to return the recordings for sealing. In other words, it found that any delay-causing mistake was an honest one. *Cf., e.g.*, *Suarez*, 906 F.2d at 982 (considering "whether deliberate or gross dereliction of duty or honest mistake cause the failure to file"). The defendants agree that the district court found Agent Bridges's belief "credible and reasonable." Nothing in the record contradicts that finding, and we find no reason to question it.

Because the government has met the two threshold requirements, we weigh three additional factors to determine whether the government's explanation is satisfactory. We look to: (1) the length of the delay, *see Rodrigues*, 850 F.3d at 11; *United States v. Suarez*, 906 F.2d 977, 982 (4th Cir. 1990); *United States v. Coney*, 407 F.3d 871, 875 (7th Cir. 2005); (2) whether the delay gave the government

a tactical advantage or prejudiced the defendant, *see Rodrigues*, 850 F.3d at 11; *Maldonado-Rivera*, 922 F.2d at 950; *Suarez*, 906 F.2d at 982; *Wilkinson*, 53 F.3d at 760; *Cline*, 349 F.3d at 1284; and (3) whether the government's explanation is objectively reasonable under the circumstances. *See Ojeda Rios*, 495 U.S. at 266–67. No one factor is dispositive; instead, they must be considered as a composite. And they may overlap. For instance, the longer the delay, the greater the chance of prejudice and the more likely that an explanation is not objectively reasonable. Indeed, there is "no stock formula by which the adequacy of an explanation can invariably be gauged . . . the trial judge must scrutinize these situations case by case, giving due weight to the factors which we have mentioned and to any other material which bears upon the reasonableness of the conduct under the circumstances." *Rodrigues*, 850 F.3d at 12 (cleaned up) (quoting *United States v. Mora*, 821 F.2d 860, 869 (1st Cir. 1987)).

As to the first factor, the district court correctly found that the delay was not lengthy. Because some defendants count the weekend as part of the relevant gap and others do not, they contend that either seven or nine days passed between when the order expired and when the recordings were sealed. So, after subtracting the two-day safe harbor, the delay was either seven or five days. Even assuming the longer seven-day period, that delay is brief. By way of comparison, in *Ojeda Rios* the Supreme Court concluded that a misunderstanding of law could excuse a delay of 118 days. 495 U.S. at 262, 267.

Turning to the second factor, the district court found that the delay did not give the government a tactical advantage. We agree. No evidence in the record suggests, nor do the defendants argue, that the government gained any tactical advantage or that the defendants were prejudiced in any way.

The only factor in any real contention is the third factor: whether the government's reasons for delaying were objectively reasonable. The defendants argue that the state law enforcement officers should have conducted legal research to determine the appropriate period for sealing. And, having done that legal research, the defendants contend that the officers would have discovered our two-day safe harbor and known that the ten-day period in the order was incorrect, making the government's reason for delaying unreasonable. We disagree. We hold instead that it was objectively reasonable for the officers to rely on the ten-day period in the authorizing court's order.

In all but the most unusual circumstances, it is objectively reasonable for a law enforcement officer to rely on a court order. As the Supreme Court has explained in the search-warrant context, suppression is not warranted "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *United States v. Leon*, 468 U.S. 897, 920–21 (1984). That is because, "[i]n the ordinary case, an officer cannot be expected to question" the court's "judgment that the form of the warrant is technically sufficient." *Id.* at 921. And suppressing evidence that officers obtained in compliance with a court

order "cannot logically contribute to … deterrence" of officer over-reach. *Id.* at 921. This reasoning "applies to wiretap applications and authorizations." *United States v. Hawkins*, 934 F.3d 1251, 1259 (11th Cir. 2019). So "[w]hen law enforcement officers act in good faith and in reasonable reliance upon a judge's [wiretap] order, exclusion is not warranted." *United States v. Goldstein*, 989 F.3d 1178, 1196 (11th Cir. 2021); *see Bansal*, 663 F.3d at 652 ("Understandable mistakes of law" are objectively reasonable explanations.).

Indeed, the whole point of Title III's sealing requirement is that the records be sealed under the authority of a neutral and detached third party—namely, the court—and not by law enforcement. *See United States v. Mendoza*, 574 F.2d 1373, 1377 (5th Cir. 1978). The judgment of a neutral magistrate is "a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer," no matter how much independent legal research the law enforcement officer may have done. *United States v. Chadwick*, 433 U.S. 1, 9 (1977), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565 (1991). Just as it makes no sense to fault an officer for his good-faith reliance on a court's search warrant, *Leon*, 468 U.S. at 920–22, it makes no sense to fault an officer for his good-faith adherence to a judge's wiretap-return schedule.

Several of our sister circuits agree. For example, in *United States v. Maxwell*, an authorizing judge set the sealing date for seven days after the wiretap authorization terminated. 25 F.3d

1389, 1394 (8th Cir. 1994). The recordings were sealed on that date, and the Eighth Circuit affirmed the district court's refusal to suppress the recordings. *Id.* It explained that following a judge's schedule is a "satisfactory explanation[] for slight delays in presenting wiretap recordings for sealing." *Id.*; *see also United States v. Pedroni*, 958 F.2d 262, 266 (9th Cir. 1992) (holding that the unavailability of the issuing judge is a satisfactory explanation for a delay); *United States v. Ardito*, 782 F.2d 358, 362–63 (2d Cir. 1986) (holding that an intervening holiday coupled with the unavailability of the judge excused a brief delay); *cf. Wilkinson*, 53 F.3d at 760 (affirming that a "good faith misunderstanding of the law" is a satisfactory explanation for a delay); *Maldonado-Rivera*, 922 F.2d at 951–52 (holding that a mistaken view of Title III's requirements was a satisfactory explanation for delay because the mistaken belief was "genuine" and "credible").

It would have been less reasonable for the officers to rely on the state court's order if the state court judge had "wholly abandoned his judicial role" in authorizing the return within ten days or if the order was "so facially deficient" that an officer could not "reasonably presume it to be valid." *Leon*, 468 U.S. at 923. But neither exception applies here.

As to the first exception, the judge did not abandon his judicial role. He scrutinized the draft orders, changed them, and specifically told Agent Bridges to add the ten-day language to the orders before signing them. The process was firmly under the judge's control.

We also cannot say that the authorizing order's ten-day period was "so facially deficient" that the agents could not "reasonably presume it to be valid." *Id.* For one, ten days is the typical period for search warrants. *See United States v. Gerber*, 994 F.2d 1556, 1559–60 (11th Cir. 1993) (citing Fed. R. Crim. P. 41(c)). And the Georgia sergeant testified that the ten-day language was "standard" in state wiretap authorization orders, that it had been used in state wiretap authorizations going back "[a]s far as [he] kn[e]w," and that he had no reason to think that the ten-day language "that ha[d] been in place for years and years was wrong." Indeed, the Northern District of Georgia has recently addressed other state wiretap authorizations that use nearly identical ten-day language. *See United States v. Lasher*, 2019 WL 3369432, at *6 (N.D. Ga. April 2, 2019); *United States v. Bourassa*, 2019 WL 7559293, at *3, *12–13 (N.D. Ga. July 25, 2019). The "go-bys" on which Agent Bridges relied also used nearly identical ten-day language. Given the circumstances, Agent Bridges and the others involved could reasonably presume that the order was valid. Because these officers relied on the court's orders and followed them in conducting the wiretaps and in returning the recordings, their actions were objectively reasonable.[2]

---

[2] Because the officers returned the recordings within the ten-day period and it was objectively reasonable for the officers to rely on the state court's order, we do not address whether it was also objectively reasonable for the officers to believe that they needed to finish transcribing, perfecting, and copying the recordings before returning the originals.

The defendants' arguments to the contrary are not persuasive. The defendants repeatedly assert that Agent Bridges "failed to review the Georgia wiretap statute, the federal wiretap statute, case law, or consult with either colleagues or a prosecutor." This argument fails for two reasons.

First, that statement is factually incorrect, at least in part. Although Agent Bridges did not read the federal statute because he "was intending on taking it to a superior court judge on the state side," he did review the Georgia wiretap statute, as well as the "go-bys," which had the ten-day language. Agent Bridges also met and consulted with an assistant United States attorney before applying for the state wiretap. When preparing the application, he "discuss[ed] it with prosecutors, as well as … [his] supervisors." In fact, the district attorney reviewed and edited all of Agent Bridges's applications and orders. The district court expressly found that the state prosecutor worked with and reviewed Agent Bridges's work and that his superior agents provided advice and materials for this wiretap application specifically. *See Carson*, 969 F.2d at 1494–95 (opining that a person cannot "be faulted for following instructions … from the person in charge of the case or investigation" and that relying on a supervisor's opinion could make actions objectively reasonable); *cf. United States v. Maldonado-Rivera*, 922 F.2d 934, 951–52 (2d Cir. 1990) (affirming the district court's holding that reliance on a co-worker's instructions about the sealing requirement, which was a mistake of law, was a satisfactory explanation).

Second, as we have already explained, law enforcement agents do not act unreasonably when they decline to doublecheck a judge's wiretap order with their own independent legal research. Title III puts the court in charge of the process, not law enforcement. Here, because the court controlled the process and the ten-day deadline was not facially deficient, we conclude that the agents reasonably complied with that deadline.

Considering the absence of tampering, the government's good faith, the short delay, the lack of tactical advantage to the government or prejudice to the defendants, and the objective reasonableness of the agents' actions, the government has provided a satisfactory explanation for any delay in sealing.

## C.    Jurisdictional Issue

Lastly, we turn to the jurisdictional issue. Under Title III, if a wiretap "unlawfully intercept[s]" a communication or "the order of authorization … under which [a communication] was intercepted is insufficient on its face," the communication should be suppressed. 18 U.S.C. § 2518(10)(a). Title III allows "a judge of competent jurisdiction" to authorize a wiretap "within the territorial jurisdiction of the court in which the judge is sitting." 18 U.S.C. § 2518(1), (3). "The 'territorial jurisdiction' over which a court has authority depends entirely on state law." *Luangkhot v. State*, 736 S.E.2d 397, 400 (Ga. 2013) (citing *Adams v. Lankford*, 788 F.2d 1493, 1499–1500 (11th Cir. 1986)). The defendants argue that any calls made outside of Georgia were "unlawfully intercepted" and

that the authorization orders here were facially invalid because they authorized interceptions of communications outside the state judge's jurisdiction.

We look to Georgia law to see if the state court exceeded its jurisdiction. Under Georgia law, superior courts have statewide jurisdiction to issue wiretap orders, meaning that any superior court has jurisdiction to authorize the "interception of communications" anywhere in Georgia. O.C.G.A. § 16-11-64(c) ("[A superior court] may issue an investigation warrant permitting the use of a device for the surveillance . . . . Such warrant shall have state-wide application and interception of communications shall be permitted in any location in this state."). The Georgia Supreme Court has held that "interception" occurs both at the "listening post" where the call is heard and at the location of the targeted phone when it makes or receives a call. *Luangkhot*, 736 S.E.2d at 426. So, under state law, Georgia courts have "the authority to issue wiretap warrants for the interceptions" of calls if either "the tapped phones or the listening post are located" within their jurisdiction. *Id.* at 428. Put simply, as long as the listening post is within the state of Georgia, it does not matter where the call is made. *Id.* at 426. Here, because the listening post was undisputedly in Georgia, the state court did not exceed its jurisdiction in authorizing the interception of out-of-state calls at the in-state listening post.

Although the defendants say that they are resting their jurisdictional argument only on state law, they also allude to federalism concerns and raise the specter of limitless state-court jurisdiction.

But this problem—if it is a problem—"stems from the statutory language." *United States v. Cano-Flores*, 796 F.3d 83, 88 (D.C. Cir. 2015). "Whatever boundlessness the theory may imply is due to the fact that phones used" outside of an authorizing court's territorial jurisdiction "can be tapped in a way that allows agents to first hear them" within the authorizing court's territorial jurisdiction. *Id.* That is why our sister circuits have held that Title III "permits [state] courts to authorize within-jurisdiction interceptions of conversations that took place wholly outside of [the state]," *United States v. Jackson*, 849 F.3d 540, 551–52 (3d Cir. 2017), or even wholly outside of the country, *Cano-Flores*, 796 F.3d at 87. The safeguard on the scope of state court's wiretap authority is the requirement that law enforcement establish probable cause for the intrusion, not a geographical limit on the phone calls that can be monitored. Under Georgia law and consistent with Title III, the state court here did not exceed its jurisdiction when it authorized the interception of calls made outside of the state but first heard at a listening post within the state.

## IV.    CONCLUSION

For the foregoing reasons, the district court is **AFFIRMED**. To the extent he challenges his sentence, Mayfield's appeal is **DISMISSED** based on the appeal waiver in his plea agreement.

18-12569                    Jordan, J., Concurring                    1

Jordan, Circuit Judge, Concurring in Part and Concurring in the Judgment:

I join all of Judge Brasher's well-written opinion for the court except for Part III.B, which addresses whether the government presented a "satisfactory explanation" for the delay in sealing under 28 U.S.C. § 2518(8)(a).  On that issue, I agree that the government's explanation was satisfactory, but my reasoning differs somewhat.[1]

All of the wiretaps ended on February 17, 2016, and the original discs with the recordings of the intercepted calls were presented to the state judge nine days later, on February 26, 2016.  As noted in the court's opinion, the interception orders contained language requiring that the returns be made (a) within 40 days of the orders being issued or (b) within 10 days of the last interception, whichever was earlier.

The government provided three reasons for the nine-day delay in presenting the recordings to the state judge for sealing.  First, it followed the judge's order, which provided for a ten-day return period.  Second, it believed that the 10-day period was correct

_____

[1] Although the term "satisfactory explanation" has some overlap with the legal concept of good faith, I would prefer not to analogize to the "good-faith" exception to the exclusionary rule articulated in *United States v. Leon*, 468 U.S. 897, 920–21 (1984).  Here we are dealing with a statutory suppression remedy—containing a built-in statutory exception—for a statutory violation. *See* 18 U.S.C. §§ 2518(8)(a), (10)(a).

because previous orders had contained that same period of time. Third, the government thought that it had to finish all of the transcripts and copies of the recordings before returning the originals to the judge for sealing.

One of our early wiretap decisions, *United States v. Sklaroff*, 506 F.2d 837, 840–41 (5th Cir. 1975), held that a 14-day delay in presenting the recordings to the judge who issued the interception order did not violate § 2518(8)(a) because (a) there was no indication that the defendants had been prejudiced, (b) there was no showing that the "integrity of the recordings was in any way violated," and (c) there was "substantial compliance" with the requirements of the statute. That decision, however, was superseded by *United States v. Ojeda-Rios*, 495 U.S. 257, 264–65 (1990), in which the Supreme Court ruled that § 2518(8)(a) "requires a *satisfactory* explanation, not just an explanation," for a delay in sealing and rejected the argument that "proof of nontampering is a substitute for a satisfactory explanation."

The interception orders at issue here were sought by a state law enforcement officer and issued by a state judge pursuant to Ga. Code § 16-11-64(c) (which expressly incorporates Chapter 119 of Title 18 of the U.S. Code). It seems to me, therefore, that determining whether the government's explanation for the delay in sealing was satisfactory should involve consideration of Georgia law as well as federal law. After all, Georgia law enforcement officers who seek orders authorizing electronic surveillance are expected to be aware of both state law and federal law governing wiretaps.

*Cf. United States v. Feiste*, 961 F.2d 1349, 1351 (8th Cir. 1992) (considering, in a case involving interception orders issued by a state judge, the testimony of a state law enforcement officer about his understanding of state law in determining whether the government presented a "satisfactory explanation" for a delay in sealing).

In 1993, the Georgia Court of Appeals held that a three-week delay in presenting wiretap recordings to a judge for sealing violated § 2518(8)(a). *See Porter v. State*, 432 S.E.2d 629, 630–32 (Ga. App. 1993). In that case, however, the state "offered no explanation for the delay" except for the testimony of the lead investigator, who said that he "was unaware that federal law required that the tapes be submitted immediately to the court for sealing." *Id.* at 630. Applying *Ojeda-Rios*, the Georgia Court of Appeals concluded that sealing by law enforcement officials does not satisfy the statutory requirement that the recordings be presented to a judge for sealing. *See id.* at 631. And it explained that "it is the duty of those who enforce the law to follow it and ignorance thereof can no more excuse the conduct of the state than it would excuse the conduct of the defendant." *Id.* at 632.

More than a decade later, we held in *United States v. Matthews*, 431 F.3d 1296, 1307 (11th Cir. 2005), that the immediacy requirement of § 2518(8)(a) is satisfied if sealing of the recordings takes place within one to two days of the expiration of the interception order. *Matthews*, decided more than a decade before the wiretaps at issue here, suggests that the government's reliance on

the 10-day period set out in the state judge's orders may have been dicey.

But as we (and other circuits) have explained, state courts are not bound by the decisions of the lower federal courts on issues of federal law. *See, e.g., Pitts v. United States*, 4 F.4th 1109, 1116 n.3 (11th Cir. 2021); *Mass. Delivery Ass'n v. Coakley*, 671 F.3d 33, 47 (1st Cir. 2012); *Magourik v. Phillips*, 144 F.3d 348, 361 (5th Cir. 1998). So, the Georgia courts could have disagreed with our interpretation of the word "immediately" in § 2518(8)(a). And it was not until March 7, 2016—about three weeks after the discs with the recordings were presented to the state judge in this case—that the Georgia Supreme Court addressed the meaning of "immediately." In *Finney v. State*, 783 S.E. 2d 598, 600–01 (Ga. 2016), the Georgia Supreme Court held that "immediately" means as soon as practicable after the electronic surveillance ends, which should be only a few days at most.

"In establishing a reasonable excuse for a sealing delay, the [g]overnment is not required to prove that a particular understanding of the law is correct but only that the interpretation was objectively reasonable at the time." *Ojedas-Rios*, 495 U.S. at 266. As noted, one of the reasons the government provided for the delay in sealing was its reliance on the 10-day return period in the interception orders issued by the state judge. That reason was, in my view, satisfactory under the "totality of the circumstances." Anne T. McKenna & Clifford S. Fishman, Wiretapping and Eavesdropping § 19:19 (Dec. 2021 update). First, although the government's

18-12569              JORDAN, J., Concurring                    5

reliance on the order turned out to be misplaced, the absence of caselaw from the Georgia courts about what "immediately" meant under § 2518(8)(a) was enough to make the reliance objectively reasonable at the time.  Second, the 1993 decision in *Porter* by the Georgia Court of Appeals was distinguishable because that case involved a three-week delay and there was "no explanation as to why the delay occurred other than [the officer] was unaware of the immediacy requirement." *Porter*, 432 S.E.2d at 630, 632.   Third, after *Ojeda-Rios* (and before 2016) some federal courts had held that an issuing judge's order setting a specific date for sealing (usually due to availability concerns) can provide a "satisfactory explanation" for delay. *See United States v. Maxwell*, 25 F.3d 1389, 1394 (8th Cir. 1994) (seven-day delay); *United States v. Pedroni*, 958 F.2d 262, 266 (9th Cir. 1992) (fourteen-day delay). *Accord* McKenna & Fishman, Wiretapping and Eavesdropping, at § 19:19 ("Several courts have held that the issuing judge's instructions to put off sealing for a few days is a satisfactory explanation.").[2]

---

[2] Had the Georgia Supreme Court issued its decision in *Finney* before the wiretaps ended, I doubt that the government could have reasonably relied on the 10-day period set out in the interception orders.  In that scenario, under the governing precedent of both the Eleventh Circuit and the Georgia Supreme Court a sealing delay of more than one or two days would not have been permissible.